### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| Citterece McGregor, as personal representative and administrator of Kristopher McGregor, deceased, and on her own behalf, | |
| Plaintiffs, | |
| v. | **Case No.** |
| Harris County, Texas; | |
| Ed Gonzalez, in his individual and official capacities; | JURY TRIAL DEMANDED |
| and | |
| Naomi Lockett, in her individual and official capacities, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Citterece McGregor, on her own behalf, and as personal representative and administrator of the Estate of Kristopher McGregor, deceased, by and through her undersigned attorneys, complains against the above-named Defendants as follows:

Kristopher McGregor was a dedicated young man with a bright future. He was a student at the University of Houston. Through hard work and enormous dedication he earned a spot as Safety on its Division I football team. But

1

Kristopher began experiencing symptoms of mental illness.  He dropped out of college.  Eventually, in 2019, he was diagnosed with schizophrenia.  Due to that condition, Kristopher struggled to care for his basic needs and was often unable to advocate for himself. This was especially evident during his periods of incarceration at the Harris County Jail, where he was detained repeatedly after his mental illness began impacting his behavior.  On various occasions, detention and medical staff at the jail reported that Kristopher was experiencing delusions and was unable to care for his basic needs.  For prolonged periods of time at the jail, Kristopher did not eat or drink, resulting in chronic malnutrition and life-threatening illness. Kristopher's schizophrenia also prevented him from seeking medical care when he needed it.

On January 2, 2025, Kristopher was arrested and brought to Harris County Jail. He quickly began to exhibit the symptoms of his mental illness, refusing to shower and struggling to maintain basic hygiene.  He was unable to engage with staff or healthcare providers, and eventually stopped eating and drinking.  As his mental and physical health deteriorated, he remained unable to advocate for his needs.

While he was at the jail, Kristopher contracted strep throat.  Strep throat is a common bacterial infection.  It is relatively easy to treat.  If left untreated, however, the strep throat infection can spread through the body and ultimately cause death. Because of his mental illness, Kristopher was unable to seek medical treatment for his strep infection. It was evident to jail and medical staff, however, that he was

2

sick, and this only became more obvious to staff as his condition worsened. Despite their awareness of his illness, jail staff ignored Kristopher's needs. Jail staff also failed to provide Kristopher with a means to access medical care given his known difficulty seeking and obtaining medical care on his own.

On January 29, 2025, Kristopher was found on the floor of his cell, disoriented and struggling to breathe. He was sent to the clinic and eventually transported to Ben Taub hospital in Houston, Texas. By that time, the strep infection had spread throughout his body and entered his bloodstream. He was in septic shock, starving, and dehydrated. His throat had closed, and his kidneys and respiratory system were failing. On January 30, 2025, after going into cardiac arrest, Kristopher was pronounced dead. He was only thirty-nine years old.

Kristopher's preventable death is symptomatic of Harris County's chronically inadequate health care system and persistent deliberate disregard of detainees' serious medical needs. The prevailing attitude of indifference to the health and safety of detainees at the Harris County Jail is well-established and well documented. Since 2022, the Texas Commission on Jail Standards has deemed Harris County Jail noncompliant with the state's minimum jail standards. Documented cases of medical neglect and wrongful death in the jail have led to the filing of dozens of civil rights complaints against Harris County over the past decade, and countless others have been the subject of public outcry. Policymakers and employees of the Harris County Jail have repeatedly and continuously been put on notice of the grave systemic deficiencies in the delivery of health care, including

mental health care, to detainees. Despite the staggering number of preventable in-custody deaths, severe injuries and illnesses, and reports of extreme suffering occurring within the Harris County Jail, policymakers and officials responsible for the delivery of care in the jail continue to violate the rights of pretrial detainees through their inaction and implicit authorization..

Kristopher's mother brings this action to hold accountable persons and entities responsible for ignoring Kristopher's needs and denying access to medical care. Kristopher's suffering was needless, and his death was entirely preventable. He leaves behind a grieving family who will be forever changed by this tragic loss.

## JURISDICTION

1.      This action arises under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PARTIES

3.      Plaintiff Citterece McGregor is Kristopher McGregor's mother. She brings this action as Personal Representative of Kristopher McGregor and as

Administrator of the Estate of Krisopher McGregor. She also brings this action on her own behalf.

4.    Defendant Harris County, Texas ("Harris County") is a governmental entity and a political subdivision of the state of Texas. The Harris County Sheriff's Office is a division of Harris County and operates the Harris County Jail ("HCJ" or the jail). Harris County Health is also a component of Harris County. Harris County Health is responsible for the delivery of medical and mental health services to people detained at the Harris County Jail.

5.    Defendant Ed Gonzales ("Sheriff Gonzales") is the Sheriff of Harris County, Texas. He is sued in his individual and official capacities. In his Official capacity, Sheriff Gonzalez is included in all references to "Harris County" and the Harris County Sheriff's Office.

6.    Defendant Dr. Naomi Lockett is the medical director for Harris County Jail and, at all times pertinent hereto, oversaw the medical care of individuals in custody at Harris County Jail. She is sued in her official and individual capacities.

## FACTS COMMON TO ALL COUNTS

7.    At the time of his death, Kristopher McGregor was a resident of Houston, Texas. He was 39 years old.

8.    Kristopher was diagnosed with schizophrenia in 2019.

9.    Kristopher's schizophrenia manifested in delusional thoughts, hallucinations, depression, and in difficulty taking care of himself.

A.    **Kristopher's documented history of mental illness at HCJ in 2024.**

10.    Before the period of detention leading to his death, Kristopher was previously incarcerated at the Harris County Jail from March 30, 2024, through September 20, 2024.

11.    Harris County is responsible for providing detainees at the jail with food, water, and medical care.

12.    Jail detainees generally access the food and water offered at the jail by eating and drinking of their own volition.

13.    Jail detainees generally access medical care offered by the jail by affirmatively requesting such care from jail staff as their needs arise.

14.    Because of his mental illness, Kristopher had difficulty eating and drinking of his own volition at the jail.

15.    Because of his mental illness, Kristopher had difficulty requesting medical care even when he needed it.

16.    Medical and correctional staff at Harris County Jail were aware of Kristopher's schizophrenia diagnosis and were familiar with the symptoms he exhibited as a result.

17.    During this time, jail and medical staff were aware that Kristopher suffered from schizophrenia, that he was in denial about his diagnosis, and that he frequently refused or was unable take care of himself, including by seeking medical or mental health care when he needed it.

18.    Jail and medical staff who administered care to Kristopher during this time frequently noted that he was internally preoccupied and guarded, that he

struggled to maintain eye contact and exhibited poor judgment and insight, that he experienced delusions and denied suffering from mental illness, and that he often failed to acknowledge or engage with staff during visits.

19.    Jail and medical staff were aware that Kristopher rarely showered or maintained basic hygiene.  As a result, Kristopher was often threatened by other inmates who complained about his odor. Staff frequently moved Kristopher to different cells due to his vulnerability to harm from other detainees.

20.    Kristopher's mental illness and delusional thoughts also interfered with his ability to eat and drink.  During his jailing in 2024, he lost a dangerous amount of weight while at the jail and had to be treated for anorexia, malnutrition, and failure to thrive.

21.    Jail and medical staff were aware of this ongoing issue and frequently reported that he was not eating his meals and was visibly frail.

22.    In July of 2024, Kristopher was transported from the jail to the emergency room at Ben Taub hospital due to his failing health. He was extremely weak, coughing, and experiencing chest pain.

23.    Doctors determined that he was suffering from physical deconditioning, failure to thrive or malnutrition, and dehydration.

24.     Food refusal is common among people with schizophrenia, with one study identifying food refusal behavior in 56.5% of the subject schizophrenic patients.[1]

25.     Failure to seek medical care is also common among people with schizophrenia, often due to anosognosia (lack of insight the illness exists), irrational fear of the side effects of care, paranoia, or symptoms (like delusions) distorting reality.

26.     After he was sent back from the hospital to the jail, Kristopher continued to experience similar health issues related to his mental illness.

27.     Kristopher remained underweight and was not eating.

28.     He was occasionally given a nutritional drink with his meals, but his consumption of these supplements was not adequately monitored.

29.     On one occasion, nurses found nearly twenty unopened cans of the nutritional supplement in his cell.

30.     In September of 2024, his mental and physical condition continued to deteriorate.

31.     His inability to keep up with basic hygiene continued to result in threats from other inmates, and he contracted lice. As a result, he was placed in quarantine housing.

---

[1]  Portia N. Osuji, Justus U. Onu, *Feeding behaviors among incident cases of schizophrenia in a psychiatric hospital: Association with dimensions of psychopathology and social support*, Clinical Nutrition ESPEN, Volume 34, 2019, Pages 125-129, ISSN 2405-4577, https://doi.org/10.1016/j.clnesp.2019.08.001.

32.    Upon visits to his cell, staff reported that Kristopher appeared filthy, and unkempt, and he emitted a foul odor. His orange uniform was visibly soiled and had turned brown.

33.    All of the foregoing symptoms and events were recorded by correctional, medical, and mental health staff in Kristopher's HCJ records.

34.    Kristopher was released from the jail in late September of 2024, after his charges were dropped.

**B.    Kristopher's incarceration at HCJ leading up to his death.**

35.    On January 2, 2025, Kristopher was arrested and returned to the Harris County Jail.

36.    After being held in the jail's joint processing facility, Kristopher was transferred to a cell in the jail's 1200 Baker Street facility on January 4, 2025.

37.    On January 5, 2025, Kristopher visited the mental health unit.

38.    Upon review of his chart, staff were made aware of Kristopher's mental health diagnosis and symptoms exhibited during his previous incarcerations at the jail.

39.    Staff noted that Kristopher appeared unkempt, guarded, and in denial, and that he was exhibiting poor judgment.  He denied any mental health, mood, or psychotic symptoms and informed staff he did not want to take medicine or accept treatment.

40.    Staff reported that there were signs that Kristopher's perception of reality was being distorted by hallucinations or delusions, and that he was

experiencing a mood disturbance such as depression, anxiety, mania, emotional detachment, and/or catatonia.

41.    Despite their awareness of this history and symptoms, staff did not take adequate steps to ensure Kristopher had access to medical care.

42.    On January 12, 2025, six days later, a clinician visited Kristopher in his cell and reported that he was uncooperative and agitated, and that he refused to consent to treatment.

43.    The clinician's notes listed his active health concerns as schizophrenia, low weight, chest pain, subacute cough, primary polydipsia, chronic fatigue, physical deconditioning, dehydration, and adjustment disorder.

44.    Despite documenting these symptoms and Kristopher's evident difficulty accessing nourishment and medical care, the clinician did not take steps to ensure Kristopher had access to those services, nor did they provide any medical treatment.

45.    Kristopher was also unable to maintain basic hygiene and was frequently threatened by other inmates due to his lack of showering.  Such incidents were reported by detention officers on January 10, 12, 14, and 15.

46.    Staff were aware of these incidents and Kristopher's continued inability to properly care for himself or provide for his own basic needs.

47.    On January 15, 2025, Kristopher was seen by another clinician who reported that he displayed the inability to fully advocate for himself due to his mental illness.

48.     The clinician noted that Kristopher's perception of reality was possibly distorted by hallucinations or delusions, and that he spoke minimally, didn't elaborate on his responses to questions, and remained in denial with limited judgment.

49.     Despite documenting these symptoms and Kristopher's evident difficulty accessing nourishment and medical care, the clinician did not take steps to ensure Kristopher had access to those services or otherwise provide him with medical treatment.

50.     On January 17, 2025, Kristopher was seen by a social worker. He again denied any mental health issues or medical concerns.  The social worker reported that Kristopher spoke minimally with a flat affect, was unable to maintain eye contact, and appeared to be internally preoccupied.

51.     Despite the knowledge that Kristopher's mental illness prevented him from seeking care for himself, at no time did any jail or medical staff implement or provide reasonable modifications and accommodations necessary for Kristoper to access and obtain care.

52.     As Kristopher's mental health continued to deteriorate, his physical health did as well.

53.     Staff knew that Kristopher had previously been hospitalized because of food refusal, malnourishment, dehydration, and other medical deficiencies related to his serious mental illness and diminished capacity.  Given this well-documented

history, Defendants knew that Kristopher's food refusal would pose a serious risk to his life.

54.     At all times relevant, staff understood that Kristopher's decompensation as it related to his serious mental illness was so severe that he required a level of mental health treatment that they were incapable of providing.

55.     At all times relevant, jail and medical staff understood that Kristopher's mental-illness-driven decompensation inhibited his ability to access medical care and that he required an accommodation to make medical care available to him.

56.     At all times relevant, jail and medical staff understood that if Kristopher did not receive adequate mental health care for his serious mental illness, he was at serious risk of harm or death.

57.     At all times relevant, jail and medical staff understood that Kristopher's decompensation as it related to his serious mental illness was so severe it required him to be treated by medical providers and/or at a medical facility with a higher level of mental health care, such as a secure mental health hospital or clinic.

58.     During or before his January 2025 incarceration Kristopher contracted strep throat.

59.     Strep throat is a common illness that does not pose a serious threat to life if it is treated adequately and promptly.  Such treatment is typically inexpensive, easy to administer, and minimally invasive.

60.     However, due to his severe mental illness, Kristopher lacked the ability to request care.

61.     In his malnourished state, Kristopher was uniquely vulnerable to increased risks associated with the infection.

62.     During his detention it was obvious to staff that Kristopher suffered from one or more serious medical conditions and that he required medical attention.

63.     During this time it was obvious to staff that Kristopher's medical condition was rapidly deteriorating.

64.     During this time staff understood Kristopher's severe mental illness and physical weakness would preclude him from caring for himself or advocating for his medical needs as his medical condition continued to deteriorate.

65.     During this time staff understood that if they did not take affirmative steps to provide medical treatment to Kristopher and/or facilitate his access to medical care, he was at serious risk of death or other significant bodily injury.

66.     During this time staff understood that Kristopher's medical condition had become so severe that he required a level of medical care that staff at the jail were not capable of providing.

67.     During this time staff understood that Kristopher needed to be taken to a medical facility that provided a higher level of care, such as a hospital.

68.     Staff who saw Kristopher failed to take reasonable steps to treat Kristopher and/or facilitate his access to adequate medical care for him.

69.     Despite knowing of Kristopher's inability to request help, as well as his deteriorating physical health, staff failed to take steps to make medical assessments available to Kristopher.

70.     Staff also failed to perform adequate medical assessments or treatment for Kristopher.

71.     Staff failed to provide continuity of care, failed to respond to evident signs of mental and physical deterioration, and failed to implement measures necessary to address Kristopher's escalating risk of dehydration, malnutrition, infection, and respiratory illness.

72.     The delay in providing access to medical care, and the inadequacy of care Kristopher received, allowed the streptococcal infection to spread throughout Kristopher's body.

**C.     Kristopher's death.**

73.     On the morning of January 29, 2025, Kristopher was found on the floor of his cell exhibiting shallow breathing.

74.     He was taken to the jail clinic at 9:48 AM, where he continued to experience respiratory distress.

75.     At 12:23 PM he was transported to Ben Taub Hospital and admitted to the intensive care unit.

76.     At the hospital, Kristopher's vitals were abnormal, and he appeared severely malnourished and dehydrated.

77.     He experienced acute mental distress and was incoherent, combative, and disoriented.

14

78.     Tests revealed that the streptococcal infection had entered his bloodstream, causing septic shock and toxic shock syndrome.

79.     The infection had spread throughout Kristopher's body and his kidneys had started to fail.

80.     His throat had closed, and he was intubated due to continued respiratory failure.

81.     In the evening of January 30, 2025, Kristopher went into cardiac arrest. At 6:42 PM he was pronounced dead.

82.     He was thirty-nine years old at the time of his death.

83.     During the course of the foregoing events and his incarceration at Harris County Jail, Kristopher suffered severe physical and emotional pain and distress.

84.     Throughout his incarceration at the jail, Defendants were on actual and/or constructive notice of Kristopher's serious medical needs and mental disability yet failed to take appropriate action.

**D.    Harris County's policy and practice of failing to provide adequate medical care to detainees in Harris County Jail.**

85.     The failure to provide Kristopher with appropriate medical care was driven by the policies and practices of Defendant Harris County, which permit and tacitly endorse such unlawful treatment.

86.     At all times relevant to the events at issue in this case, Harris County, under the direction of Defendant Gonzalez, was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures

15

regarding the provision of medical care to people in its custody, including people in custody at Harris County Jail.

87.    Harris County is and was responsible for ensuring that detainees receive adequate medical care.

88.    Defendant Naomi Lockett, as the medical director of Harris County Jail, was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

89.    Upon information and belief, Defendant Lockett performed her duties on-site at the jail, and observed and/or interacted with Kristopher between January 15, 2025, and January 29, 2025.

90.     Prior to the events giving rise to Plaintiff's Complaint, Defendants had notice that people in HCJ custody with serious medical needs—people like Kristopher—were routinely denied medical care and access to medical care due to widespread policies and practices by healthcare and correctional staff at HCJ.

91.    Healthcare and correctional employees at the jail routinely delay or completely ignore the clear symptoms of serious medical needs exhibited by detainees, including those whose medical records reflect an obvious need for treatment.

92.    Despite knowledge of these unlawful policies and practices, Defendants did nothing to ensure that detainees at the jail received adequate medical care and access to medical care, thereby acting with deliberate indifference.

93.     Specifically, there exist widespread policies and practices within Harris County Jail pursuant to which detainees receive unconstitutionally inadequate healthcare.  Detention officers and medical personnel, commonly fail or refuse to: (1) take action to secure appropriate continuity of care for complicated and urgent conditions; (2) adequately observe and monitor detainees with known medical and mental health conditions; (3) provide necessary treatment and essential medications; (4) properly examine a detainee with a serious medical condition;  (5) respond to detainees who exhibit obvious signs of a serious medical condition or illness; or (6) facilitate access to a higher level of medical or mental health care, such as a hospital, when it becomes apparent that a detainee's needs are beyond the capabilities of the jail staff.

94.     These widespread policies and practices have flourished because Defendants, Harris County, Ed Gonzalez, and Naomi Lockett, have directly encouraged the type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

95.     In this way, Defendants violated Kristopher's rights by maintaining policies and practices that were the moving force behind the foregoing constitutional violations.

96.     The above-described practices, so well-settled as to constitute de facto policy within the Harris County Jail, were able to exist and thrive because

Defendants were deliberately indifferent to the problem, thereby effectively ratifying it.

97.    Because these policies and practices were implemented and carried out at the HCJ, Defendants Ed Gonzalez and Naomi Lockett were aware of them as well, but they failed to take reasonable steps to stop them, effectively adopting a policy of indifference and tacit approval.

98.    The unconstitutional acts that ultimately resulted in Kristopher's death were done in accordance with the official policies and widespread practices of the Defendants Harris County, Ed Gonzalez, and Naomi Lockett.

99.    The following are examples of such policies in practice, and their tragic results:

100.    In 2013, a whistleblower notified a jail compliance team that jail staff had subjected Terry Goodwin—a pretrial detainee at HCJ with a documented history of mental illness—to horrific living conditions.  Upon visiting his cell, the compliance team found Mr. Goodwin filthy and wearing a shredded jail uniform, pieces of which were hanging from the ceiling where he had attempted to hang himself.  The cell was infested with bugs and covered in trash, and his sink, toilet, and shower were clogged with feces and toilet paper.  HCJ staff had not conducted observation of Mr. Goodwin outside of officers dropping off meals, and had not opened his cell in months, as instructed by a sign on the door not to open the cell. Officers, supervisors, medical staff, and administrators at the HCJ knew about the conditions Mr. Goodwin was being kept in, yet did nothing to intervene.  Because

HCJ staff kept him in these conditions and denied him care, his mental health deteriorated severely.  HCJ staff only removed Mr. Goodwin from his cell and placed him in a mental health facility after he was discovered by whistleblowers.

101.    On May 6, 2020, Wallace Harris, an inmate at the HCJ, died due to an ongoing medical condition that staff failed to treat. Mr. Harris had a known history of hypertension and required ongoing medication and treatment.  During his time at the jail, HCJ staff did not provide him with adequate medical screening or care. On May 6, 2020, he was discovered unresponsive on the floor of his cell with shallow breathing. After being taken to the hospital, he was declared deceased. HCJ staff's failure to properly observe and monitor Mr. Harris drove inadequate and untimely medical care that ultimately resulted in his death.

102.    On September 13, 2020, David Perez, an inmate at the HCJ, was found unresponsive in his cell.  He was transported to the hospital and declared deceased on September 15, 2020.  His cause of death was medically undetermined.  HCJ staff's failure to properly observe and monitor Mr. Perez and conduct face-to-face observations drove inadequate and untimely medical care that ultimately resulted in his death.

103.    On February 8, 2021, Israel Lizano Iglesias died shortly after being admitted to the HCJ. Staff placed him in a holding cell and failed to adequately observe him.  As a result, he did not receive medical care for his known ongoing condition.  Other detainees informed jail staff that Mr. Iglesias needed medical attention. Only then was he transported to the hospital, where he died shortly after.

104.    On May 11, 2021, Roy Ward Jr., an inmate at HCJ, was found slumped over in his cell.  Mr. Ward had been assaulted by another inmate several days earlier and punched in the head six times.  HCJ staff provided Mr. Ward with minimal treatment for his injuries and no diagnostic examinations.  Staff placed him back in his cell without any further medical attention and failed to monitor him adequately in light of his known injuries.  Shortly after staff discovered him unresponsive in his cell on May 11, he was taken to the hospital and pronounced deceased due to blunt force head trauma.

105.    On August 28, 2021, HCJ staff found Gregory Barrett, an inmate at HCJ, dead on the floor of his cell.  Mr. Barrett was booked into HCJ with known pre-existing medical conditions.  On August 26, he reported to his wife that he did not feel well and was vomiting blood.  The next day, he was still vomiting blood and had not received any medical attention despite the obvious need for such. Officers did not properly monitor Mr. Barrett and he was found dead in his cell.

106.    On May 20, 2022, Kristan Smith, an inmate at the HCJ, was found unresponsive in her bunk.  Ms. Smith had a known history of diabetes and blood pressure issues and required medication for both conditions. However, staff failed to provide Ms. Smith with her necessary medication in a timely and consistent manner.  Officers failed to properly observe or monitor  Ms. Smith and failed to notice when she started suffering a medical emergency in her cell.  Other detainees notified staff when she became unresponsive.  On May 28, 2022, Ms. Smith was declared deceased due to the failure to receive her diabetes medication.

107.    On July 31, 2022, detention officers found Jim Franklin Lagrone, an inmate at the HCJ, vomiting into his toilet.  Despite HCJ staff's awareness of Mr. Lagrone's history of drug usage and recent arrest for drug possession, HCJ staff did not screen him for medical care upon intake, nor did they provide him with any medical care after observing that he was ill in his cell.  A few hours later, he was discovered unresponsive and declared deceased shortly after.

108.    On October 1, 2022, Bryan Marquis Johnson, an inmate at HCJ, suffered a medical emergency and was pronounced dead shortly after. Mr. Johnson had previously reported to his mother that he was experiencing shortness of breath in the jail.  He visited the clinic several times but HCJ staff did not provide him with adequate treatment.  As his condition worsened, his mother began calling officials and staff at the jail to beg them to provide her son with adequate medical care.  She reported that they refused to do anything.  On October 1, 2022, she was notified that her son had suffered a medical emergency and died.  His official cause of death was an inflammatory disease which is often easily treatable with steroids.

109.    On May 16, 2023, Robert Terry Jr., an inmate at HCJ, suffered a medical emergency in his cell.  He called for help by pressing the intercom button in his cell shortly before falling to the floor.  He began to foam at the mouth and attempted to crawl to the dayroom to get help.  Staff failed to promptly respond to Mr. Terry's request for medical attention.  When they arrived 90 minutes later, they did not attempt to render aid but instead laughed and taunted Mr. Terry.  He passed away later that morning as a result of his failure to obtain medical care.

**E.    Defendants were repeatedly put on notice of Harris County's unconstitutional policies and practices.**

110.    In 2008, the conditions of the Harris County Jail received national attention when the Department of Justice investigated the jail for constitutional violations.

111.    The DOJ found in 2009 that there were systemic deficiencies throughout the jail that violated the constitutional rights of detainees.  Specifically, they found that the jail failed to provide detainees with adequate medical care, mental health care, protection from serious physical harm, and protection from life safety hazards.

112.    Since then, Harris County has not adequately addressed these conditions, and they remain persistent in the jail.

113.    When Defendant Gonzalez was elected Sheriff of Harris County in 2016, he was aware of the history of unconstitutional conditions and treatment of inmates at Harris County Jail.[2]

114.    The Texas Commission on Jail Standards ("TCJS") is a regulatory body that oversees and monitors jails in the state to ensure that those incarcerated receive humane treatment.  TCJS has found the Harris County Jail to be out of compliance with state standards almost twice per year since 2018. A selection of these notices are detailed below:

---

[2]  *See, e.g.*, Houston Public Media, Democratic Sheriff Candidate Ed Gonzalez Calls For Overhaul Of Harris County Jail  (Sept. 10, 2016) (describing Gonzalez campaign call for improvement of jail conditions) *available at*: https://www.houstonpublicmedia.org/articles/news/2016/09/20/168973/democratic-sheriff-candidate-ed-gonzalez-calls-for-overhaul-of-harris-county-jail/.

115.    In March of 2016, TCJS issued a notice of noncompliance due to Harris County's failure to provide medical services to a detainee despite the detainee making five different medical requests, which spanned over the course of an entire month.

116.    On December 9, 2020, TCJS issued an annual inspection report finding the jail noncompliant in multiple areas.  Specifically, HCJ staff were filling out mental health screening forms incorrectly and were failing to conduct timely face-to-face observations of inmates, which resulted in the failure to provide sufficient and timely medical care.

117.    On April 5, 2021, TCJS found that Harris County was still in noncompliance with minimum observation requirements at the jail, resulting in the failure to provide sufficient and timely medical care to inmates.

118.    On December 19, 2022, TCJS issued a notice of noncompliance following a special inspection regarding the in-custody death of Matthew Shelton. Mr. Shelton passed away in March 2022 while in HCJ custody due to staff's failure to provide medication for his known medical conditions.  Despite being given a doctor's order explaining that Mr. Shelton's access to such medication was essential for his survival, jail staff withheld the medication.  TCJS found that Harris County failed to provide, proscribe, or follow doctor's orders for providing medication to inmates like Mr. Shelton, despite being required to do so.

119.    On March 8, 2023, TCJS issued a report finding that Harris County continued to be in noncompliance with their requirement to provide sufficiently and

timely medical care to detainees.  Specifically, TCJS found that HCJ staff was failing to ensure that detainees were seen within 48 hours after submitting medical requests.

120.    On February 20, 2024, TCJS issued a report finding that HCJ was still in noncompliance with minimum observation requirements, having also been in noncompliance with this standard in August of 2023.  Specifically, the report noted that in January of 2024 alone, staff failed to meet observation frequency requirements approximately 1400 times.

121.    On January 13, 2025, TCJS issued a report finding that Harris County was again in noncompliance with minimum observation standards after investigating an in-custody death and discovering that staff were not conducting face-to-face observations as required.

122.    Despite being made aware of these life-and-death issues through numerous noncompliance notices and detainee deaths at the jail, Harris County and its policymakers, including Defendants Gonzalez and Lockett, failed to correct systemic deficiencies or make any significant changes in its policies, practices, customs, or culture.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 1983 - Against Defendant Harris County

123.    Plaintiffs incorporate paragraphs 1 through 122 and 129 through 164 as if fully restated here.

124.    Official policies and customs existed in the Harris County Jail pursuant to which inadequate medical and mental health care was provided to detainees in the Harris County Jail.

125.    Policymakers for Harris County, the Harris County Sheriff's Office, and the Harris County Jail knew about or were on notice of these policies and customs, as well as their tragic consequences.

126.    These policy makers were deliberately indifferent to said policies and customs.

127.    These policies and customs were the driving force behind the failure to provide adequate medical care to Kristopher, violating his rights, and leading to his suffering and death.

128.    Harris County is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 § 1983.

## COUNT 2
## 42 U.S.C. § 1983 – Against Defendants Ed Gonzalez and Naomi Lockett in their individual capacities

129.    Plaintiffs incorporate paragraphs 1 through 128 and 138 through 164 as if fully restated here.

130.    Defendants Ed Gonzalez and Naomi Lockett, in their individual capacities, are supervisors of one or more persons who violated Kristopher's rights.

131.    Defendant Gonzalez and Defendant Lockett adopted policies that encouraged or were indifferent to the provision of inadequate medical care within Harris County Jail.

132.    Defendants Gonzalez and Lockett knew about or were on notice of these policies and customs, as well as the grave risks and tragic consequences they engendered.

133.    The numerous in-custody deaths and findings of noncompliance with minimum medical standards by TCJS made it obvious to Defendants Gonzalez and Lockett that without a change to the foregoing policies and customs, incarcerated people like Kristopher would continue to needlessly suffer and die.

134.    The foregoing policies and customs caused the violation of Kristopher's rights under federal law and, ultimately, his suffering and death.

135.    Defendant Gonzalez and Defendant Lockett ignored the grave risks of the foregoing policies and customs and intentionally chose to maintain policies and customs with deliberate indifference to those risks.

136.    Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Kristopher.

137.    Defendant Gonzalez and Defendant Lockett are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

## COUNT 3
## American with Disabilities Act - Against Defendant Harris County

138.    Plaintiffs incorporate paragraphs 1 through 122 as if fully restated here.

139.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

140.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

141.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

142.    Harris County is a public entity as defined in 42 U.S.C. § 12132(1).

143.    As a service, program, or activity, Harris County provides food to detainees at the Harris County Jail.

144.    As a service, program, or activity, Harris County provides drinking water to detainees at the Harris County Jail.

145.    As a service, program, or activity, Harris County makes medical care available to detainees at the Harris County Jail.

146.    At all times relevant to this Complaint, in light of his severe mental illness, Kristopher was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12132(2).

27

147.   Due to his mental illness, Kristopher was substantially limited in one or more major life activities, including but not limited to his ability to think, care for his basic needs, and communicate with others.

148.   As a pretrial detainee at Harris County Jail, Kristopher was qualified to receive the services and participate in the participation of programs and activities provided by Harris County and the Harris County Jail.

149.   As a result of his mental disabilities, he required reasonable accommodations allowing him to access food.

150.   As a result of his mental disabilities, he required reasonable accommodations allowing him to access drinking water.

151.   As a result of his mental disabilities, he required reasonable accommodations allowing him to access medical care.

152.   Under Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

153.   Harris County has an obligation to provide modifications to their policies, procedures, and practices if they know or should know that a detainee is disabled and needs a modification.

154.   Despite knowing that Kristopher's obvious disability prevented him from understanding his need for treatment and advocating for himself, caring for himself and his basic needs, and thinking clearly and making decisions, including

accessing food, water, and medical care, Defendants abided by a continuous policy of discrimination against mentally ill detainees and failed to provide reasonable accommodations which would have enabled him to access food, water, and medical care on an equal basis with non-disabled detainees, such as enhanced monitoring, assisted meal intake, proactive medical rounds and vitals checks, adequate evaluations to determine capacity, or transfer to an outside facility.

155.    Due to Defendants' failure to provide Kristopher with reasonable accommodations, Kristopher was deprived of access to food, water, and medical care, ultimately leading to his death.

156.    As a result of Defendants' failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners, Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

## COUNT 4
### Section 504 of the Rehabilitation Act - Against Defendant Harris County

157.    Plaintiff incorporates all previous paragraphs as if fully restated here.

158.    Harris County provides services of food, water, and medical care to detainees of the Harris County Jail.

159.    Krisopher McGregor was qualified to receive these services.

160.    Because of his disability, Krisopher McGregor was substantially limited in his ability to access these services.

161.    In order to access these services, Kristopher McGregor required reasonable accommodations from Harris County in the manner in which it provided these services.

162.    Harris County failed to make reasonable modifications to its provision of these services in order to accommodate Kristopher McGregor's disabilities.

163.    Harris County receives federal funding.

164.    As a result of Defendants' failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners, Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

## COUNT 5
## Wrongful Death – Against All Defendants

165.    Plaintiff incorporates all previous paragraphs as if fully restated here.

166.    Kristopher died by the fault of the defendants' deliberate indifference to his serious medical needs.

167.    Plaintiff, Kristopher's mother, brings this suit to recover damages which she sustained as a result of Kristopher's death.

168.    As a result of Kristopher's death, his mother and family have lost his love, affection, and companionship.

169.    As a result of Kristopher's death, his mother and family have also experienced pain, suffering, and distress resulting from his death.

170.    Plaintiff further seeks medical and funeral expenses for Kristopher, as well as costs and attorney fees.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement against Defendants, actual damages, punitive damages, costs, attorney's fees, interest, disbursement, and any other and further relief this Court deems just and equitable.

Date: January 29, 2026                    Respectfully submitted,

_/s/ Brittany Francis_                       _/s/ Stephen H. Weil_ [with consent]

Brittany Francis                         Sam Harton*(Ill. Bar No. 6342112
brittany@peoplescounsel.org              Stephen Weil*(Ill. Bar No. 6291026)

Peoples' Counsel                         Romanucci and Blandin, LLC
1900 W. Gray Street                      321 N. Clark St.
P.O. Box 130442                          Chicago, IL 60654
Houston, TX 77219                        Tel: (312) 458-1000
Telephone: (713) 487-9809                Fax: (312) 458-1004

                                         sharton@rblaw.net
Texas Bar No. 24141616                   sweil@rblaw.net
SDTX Bar No: 3837908