**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Citterece McGregor, as personal representative and administrator of Kristopher McGregor, deceased, and on her own behalf,<br><br>Plaintiff,<br><br>v.<br><br>Harris County, Texas,<br>Sheriff Ed Gonzalez,<br>Harris County Hospital District, d/b/a Harris Health System,<br>Naomi Lockett,<br>Esmaeil Porsa,<br>Laxman Sunder;<br>Harris Center for Mental Health and IDD d/b/a Harris Center,<br>Wayne Young,<br>O. Reggie Egins,<br>Elizabeth Thoyakulathu,<br>Kenneth Ihaza,<br>Lakeisha Green,<br>Elizabeth Anderson,<br>Regenia Roach,<br>Kennedi Harris,<br>Fidelia Osifo-Selormey,<br>Ethan Sowell,<br>Paul Cormier, and<br>Lori Jefferson,<br><br>Defendants. | **Case No. 4:26-cv-00685**<br><br>Judge Keith P. Ellison<br><br>JURY TRIAL DEMANDED |

1

**SECOND AMENDED COMPLAINT**[1]

Plaintiff Citterece McGregor, on her own behalf, and as personal representative of and administrator of the Estate of Kristopher McGregor, deceased, by and through her undersigned attorneys, complains against the above-named Defendants as follows:

Kristopher McGregor was a dedicated young man with a bright future. He was a student at the University of Houston. Through hard work and enormous dedication he earned a spot as Safety on its Division I football team. But Kristopher began experiencing symptoms of mental illness. He dropped out of college. Eventually, in 2019, he was diagnosed with schizophrenia. Due to that condition, Kristopher struggled to care for his basic needs and was often unable to advocate for himself. This was especially evident during his periods of incarceration at the Harris County Jail, where he was detained repeatedly after his mental illness began impacting his behavior. On various occasions, detention and medical staff at the jail reported that Kristopher was experiencing delusions and was unable to care for his basic needs. Kristopher's schizophrenia also prevented him from seeking medical care when he needed it.

On January 2, 2025, Kristopher was arrested and brought to Harris County Jail. He quickly began to exhibit the symptoms of his mental illness, refusing to shower and struggling to maintain basic hygiene. He was unable to engage with staff or healthcare providers. As his mental and physical health deteriorated, he remained unable to advocate for his needs.

While he was at the jail, Kristopher contracted strep throat. Strep throat is a common bacterial infection. It is relatively easy to treat. If left untreated, however, strep throat can spread

---

[1] Plaintiff files this amended complaint pursuant to Rule 15(a)(2) having received the opposing party's written consent.

through the body and ultimately cause death. Because of his mental illness, Kristopher was unable to seek medical treatment for his strep infection. It was evident to jail and medical staff, however, that he was sick, and this only became more obvious to staff as his condition worsened. Despite their awareness of his illness, jail staff ignored Kristopher's needs. Jail staff also failed to provide Kristopher with a means to access medical care given his known difficulty seeking and obtaining medical care on his own.

On January 29, 2025, Kristopher was found on the floor of his cell, disoriented and struggling to breathe. He was sent to the clinic and eventually transported to Ben Taub hospital in Houston, Texas. By that time, the strep infection had spread throughout his body and entered his bloodstream, and he was in septic shock. His throat had closed, and his kidneys and respiratory system were failing. On January 30, 2025, after going into cardiac arrest, Kristopher was pronounced dead. He was thirty-nine years old.

Kristopher's preventable death is symptomatic of Harris County's chronically inadequate health care system and persistent deliberate disregard of detainees' serious medical needs. The prevailing attitude of indifference to the health and safety of detainees at the Harris County Jail is well-established and well documented. Since 2022, the Texas Commission on Jail Standards has deemed Harris County Jail noncompliant with the state's minimum jail standards.

Documented cases of medical neglect and wrongful death in the jail have led to the filing of dozens of civil rights complaints against Harris County over the past decade, and countless others have been the subject of public outcry. Policymakers and employees of the Harris County Jail have repeatedly and continuously been put on notice of the grave systemic deficiencies in the delivery of health care, including mental health care, to detainees. Despite the staggering number of preventable in-custody deaths, severe injuries and illnesses, and reports of extreme suffering

3

occurring within the Harris County Jail, policymakers and officials responsible for the delivery of care in the jail continue to violate the rights of pretrial detainees through their inaction and implicit authorization.

Kristopher's mother brings this action to hold accountable persons and entities responsible for ignoring Kristopher's needs and denying access to medical care. Kristopher's suffering was needless, and his death was entirely preventable. He leaves behind a grieving family who will be forever changed by this tragic loss.

## JURISDICTION

1.      This action arises under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Plaintiff's state law wrongful death claim pursuant to 28 U.S.C. § 1367(a), as that claim arises from the same nucleus of operative fact as Plaintiff's federal claims and forms part of the same case or controversy.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PARTIES

3.      Plaintiff Citterece McGregor is Kristopher McGregor's mother. She brings this action as Personal Representative of Kristopher McGregor and as Administrator of the Estate of Krisopher McGregor. She also brings this action on her own behalf.

4.      Defendant Harris County, Texas ("Harris County") is a governmental entity and a political subdivision of the state of Texas. The Harris County Sheriff's Office is a division of

Harris County and operates the Harris County Jail ("HCJ" or the jail).  Harris County receives federal funding.

5.     In operating the HJC, Harris County has contracted with defendants Harris Health to provide medical care and Harris Center to provide mental healthcare.  As a result, the responsibilities of the three entities (Harris County, Harris Health, and Harris Center) regarding operation of the jail are overlapping or otherwise combined.  Where that is the case, in this complaint the entities are referred to collectively and in the alternative as the "HCJ Entities." The policymakers with supervisory responsibility regarding the operations of the HCJ Entities (Defendants Gonzalez, Lockett, Porsa, Young, and Egins) are referred to collectively or in the alternative as the "Supervisor Defendants".

6.     Defendant Ed Gonzalez ("Sheriff Gonzalez") is the Sheriff of Harris County, Texas. He is sued in his individual and official capacities. In his official capacity, Sheriff Gonzalez is included in all references to "Harris County" and the Harris County Sheriff's Office.

7.     Harris County and Sheriff Gonzalez have a non-delegable duty to ensure that all people the custody of Harris County, receive adequate medical and mental healthcare care and that people in the custody of Harris County who have qualifying disabilities receive reasonable accommodations for those disabilities.

8.     Defendant Harris County Hospital District, d/b/a Harris Health System ("Harris Health"), is a governmental entity and political subdivision of the State of Texas created pursuant to Chapter 281 of the Texas Health and Safety Code. At all times relevant to this Complaint, Harris Health provided medical and mental health care services to detainees at the Harris County Jail, including Kristopher McGregor, pursuant to an arrangement with Harris County, Texas. Harris Health receives federal funding.

9. Defendant Dr. Naomi Lockett is the medical director for Harris County Jail and Harris Health and, at all times pertinent hereto, oversaw the medical care of people who were in custody at Harris County Jail. In her capacity as medical director for Harris County and Harris Health, she was responsible for establishing, implementing, and overseeing the policies, practices, and customs governing the delivery of medical and mental health care to detainees at the Harris County Jail. Dr. Lockett had authority to direct, modify, and reform Harris County Jail and Harris Health's care delivery policies at the jail, including policies governing the monitoring of detainees with serious mental illness, the provision of psychiatric medication, and the escalation of care for medically vulnerable detainees. She is sued in her official and individual capacities.

10. Defendant Esmaeil Porsa, M.D., served as the President and CEO Harris Health. In his capacity as President and CEO, Dr. Porsa with Harris Health, he was responsible for establishing, implementing, and overseeing the policies, practices, and customs governing the delivery of medical and mental health care to detainees at the Harris County Jail. Dr. Porsa had authority to direct, modify, and reform Harris Health's care delivery policies at the jail, including policies governing the monitoring of detainees with serious mental illness, the provision of psychiatric medication, and the escalation of care for medically vulnerable detainees. He is sued in his official and individual capacities.

11. Defendant Laxman Sunder, M.D., was employed by or contracted with Harris Health to provide medical services to detainees at the Harris County Jail. He is sued in his official and individual capacities.

12. Defendant Harris Center for Mental Health and IDD ("Harris Center") is a local mental health authority created pursuant to Chapter 534 of the Texas Health and Safety Code and

designated by the Texas Health and Human Services Commission as the local mental health authority for Harris County. At all times relevant to this Complaint, the Harris Center was responsible for the administration and delivery of mental health services to detainees at the Harris County Jail. The Harris Center receives federal funding.

13.    Defendant Wayne Young is the Chief Executive Officer of the Harris Center. Mr. Young was responsible for establishing, implementing, and overseeing the policies, practices, and customs governing the delivery of mental health services to detainees at the Harris County Jail, including policies governing the identification of detainees with serious mental illness at intake, the provision of mental health evaluations and treatment, and the escalation of care for mentally ill detainees who are unable to advocate for themselves. He is sued in his individual capacity.

14.    Defendant O. Reggie Egins is the Chief Medical Officer of Correctional Health for Harris Health. In his capacity as Chief Medical Officer of Correctional Health with Harris Health, Defendant Egins was responsible for establishing, implementing, and overseeing the policies, practices, and customs governing the delivery of medical and mental health care to detainees at the Harris County Jail. Egins had authority to direct, modify, and reform Harris Health's care delivery policies at the jail, including policies governing the monitoring of detainees with serious mental illness, the provision of psychiatric medication, and the escalation of care for medically vulnerable detainees. He is sued in his official and individual capacities..

15.    Defendant Elizabeth M. Thoyakulathu is a physician who was employed by or contracted with Harris Health or Harris Center to provide medical and mental health services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

16.     Defendant Kenneth O. Ihaza is a nurse practitioner employed by or contracted with Harris Health, or Harris Center, to provide medical and mental health services to detainees at the Harris County Jail. He is sued in his individual and official capacities.

17.     Defendant Lakeshia D. Green is a care coordinator who was employed by or contracted with Harris Health, or in the alternative Harris Center, to provide care coordination services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

18.     Defendant Elizabeth Anderson is a social worker who was employed by or contracted with Harris County, Harris Health, or Harris Center to provide mental health and social work services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

19.     Defendant Regenia Roach was employed by or contracted with Harris County, Harris Health, or Harris Center to provide clinical or administrative services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

20.     Defendant Kennedi Harris is a social worker who was employed by or contracted with Harris County, Harris Health, or Harris Center to provide mental health services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

21.     Defendant Fidelia Osifo-Selormey is a nurse practitioner who was employed by or contracted with Harris Health, or in the alternative Harris Center, to provide medical services to detainees at the Harris County Jail. She is sued in her individual and official capacities.

22.     Defendant Ethan Sowell is a detention officer who was employed by the Harris County Sheriff's Office and assigned to intake processing at the Harris County Jail. He is sued in his individual capacity.

23.     Defendant Paul Cormier is a classification officer who, at all times relevant to this Complaint, was employed by the Harris County Sheriff's Office and assigned to the classification unit at the Harris County Jail. He is sued in his individual capacity.

24.     Defendant Lori Jefferson is a detention sergeant who was employed by the Harris County Sheriff's Office and assigned as a supervisory officer at the Harris County Jail. She is sued in her individual capacity.

**FACTUAL ALLEGATIONS**

25.     At the time of his death, Kristopher McGregor was a resident of Houston, Texas. He was 39 years old.

26.     Kristopher was diagnosed with schizophrenia in 2019.

27.     Kristopher's schizophrenia manifested in delusional thoughts, hallucinations, depression, and in difficulty taking care of himself.

**1.  Kristopher's documented history of mental illness at HCJ in 2024.**

28.     Before the period of detention leading to his death, Kristopher was previously incarcerated at the Harris County Jail from March 30, 2024, through September 20, 2024.

29.     The HCJ Entities are responsible for providing detainees at the jail with food, water, and medical care.

30.     Jail detainees generally access the food and water offered at the jail by eating and drinking of their own volition.

31.     Jail detainees generally access medical care offered by the jail by affirmatively requesting such care from jail staff as their needs arise.

32.     Because of his mental illness, Kristopher had difficulty eating and drinking of his own volition at the jail.

33.     Because of his mental illness, Kristopher had difficulty requesting medical care even when he needed it.

34.     Jail, medical, and mental health staff at Harris County Jail were aware of Kristopher's schizophrenia diagnosis and were familiar with the symptoms he exhibited as a result.

35.     During this time, jail, medical, and mental health staff were aware that Kristopher suffered from schizophrenia, that he was in denial about his diagnosis, and that he frequently refused or was unable take care of himself, including by seeking medical or mental health care when he needed it.

36.     Jail, medical, and mental health staff who administered care to Kristopher during this time frequently noted that he was internally preoccupied and guarded, that he struggled to maintain eye contact and exhibited poor judgement and insight, that he experienced delusions and denied suffering from mental illness, and that he often failed to acknowledge or engage with staff during visits.

37.     By July 2024, Kristopher's active problem list contained the following diagnoses entered by jail medical or mental health staff: schizophrenia, moderate protein-calorie malnutrition, underweight status, dehydration, chronic fatigue, physical deconditioning, subacute cough, chest pain, and primary polydipsia. These diagnoses were recorded in his electronic medical record and were visible to every provider who accessed his chart.

38.     Jail, medical, and mental health staff were aware that Kristopher rarely showered or maintained basic hygiene. As a result, Kristopher was often threatened by other inmates who complained about his odor. Staff frequently moved Kristopher to different cells due to his vulnerability to harm from other detainees.

10

39.     Kristopher's mental illness and delusional thoughts also interfered with his ability to eat and drink. During his jailing in 2024, he lost a dangerous amount of weight while at the jail and had to be treated for anorexia, malnutrition, and failure to thrive.

40.     Staff were aware of this ongoing issue and frequently reported that he was not eating his meals and was visibly frail.

41.     In July of 2024, Kristopher was transported from the jail to the emergency room at Ben Taub hospital due to his failing health. He was extremely weak, coughing, and experiencing chest pain.

42.     Doctors determined that he was suffering from physical deconditioning, failure to thrive or malnutrition, and dehydration.

43.     Food refusal is common among people with schizophrenia, with one study identifying food refusal behavior in 56.5% of the subject schizophrenic patients.

44.     Failure to seek medical care is also common among people with schizophrenia, often due to anosognosia (lack of insight the illness exists), irrational fear of the side effects of care, paranoia, or symptoms (like delusions) distorting reality.

45.     After he was sent back from the hospital to the jail, Kristopher continued to experience similar health issues related to his mental illness.

46.     Kristopher remained underweight and was not eating.

47.     He was occasionally given a nutritional drink with his meals, but his consumption of these supplements was not adequately monitored.

48.     The practical consequence of the failure to monitor supplement consumption was documented repeatedly: on multiple occasions during his 2024 incarceration, staff found more than ten unconsumed cartons of Boost nutritional supplement lined up in Kristopher's cell. Each

of these observations was documented and filed, and none prompted a change in the method of supplement delivery or a mandatory feeding observation protocol.

49.     On one occasion, nurses found twenty unopened cans of the nutritional supplement in his cell.

50.     In September of 2024, his mental and physical condition continued to deteriorate.

51.     His inability to keep up with basic hygiene continued to result in threats from other inmates, and he contracted lice. As a result, he was placed in quarantine housing.

52.     Upon visits to his cell, staff reported that Kristopher appeared filthy, and unkempt, and he emitted a foul odor. His orange uniform was visibly soiled and had turned brown.

53.     All of the foregoing symptoms and events were recorded by correctional, medical, and mental health staff in Kristopher's HCJ records.

54.     Kristopher was released from the jail in late September of 2024, after his charges were dropped.

**2.  Kristopher's incarceration at HCJ leading up to his death.**

55.     On January 2, 2025, Kristopher was arrested again and returned to the Harris County Jail.

56.     On January 2, 2025, Detention Officer Ethan Sowell conducted Kristopher's intake medical and mental health screening at the joint processing clinic. The screening form Officer Sowell completed contained 38 questions covering mental health history, current medications, chronic illness, observable signs of mental illness, and prior psychiatric hospitalization. Officer Sowell answered every question "No." This includes for questions on whether the inmate displayed any unusual behavior, whether he showed signs of mental illness, whether he had ever received mental health services, and whether he was currently taking

12

prescription medication. No comment was entered in any field. The magistrate notification, medical notification, and supervisor notification fields were left blank. Officer Sowell affirmatively recorded that Kristopher had no possible mental health issues and declined to refer him to medical staff. At the time Officer Sowell completed this screening, Kristopher's nine-item active problem list — including schizophrenia, underweight status, dehydration, and physical deconditioning — was accessible in the HCSO system.

57.    The Harris Center operated a mental health front-door evaluation process at the Harris County Jail's intake facilities, designated as the "Harris Center Front Door/1200" evaluation. This evaluation was designed to identify detainees with serious mental illness at the point of intake and connect them with mental health services. At Kristopher's January 2, 2025 intake the Harris Center Front Door evaluation was not completed. No Harris Center mental health evaluation of any kind was initiated at intake or at any point during the first weeks of his incarceration, despite his nine-item active problem list including schizophrenia being accessible in the system and despite the Harris Center's responsibility for mental health administration at the jail. The failure to conduct the Harris Center Front Door evaluation at Kristopher's January 2025 intake meant that the one process specifically designed to identify and respond to detainees with serious mental illness at the jail's front door was not triggered for a man with a six-year documented history of schizophrenia and multiple prior incarcerations in which that history was known to the institution.

58.    On January 3, 2025, Dr. Naomi M. Lockett, Medical Director of the Harris County Jail, personally authorized and ordered a chest X-ray for Kristopher for tuberculosis screening. By ordering that test, Dr. Lockett accessed Kristopher's chart and, as a matter of record, had access to his active problem list, which at that time carried nine documented medical

conditions including schizophrenia, underweight status, dehydration, subacute cough, and physical deconditioning. All conditions directly relevant to his capacity for self-care. The chest X-ray was negative for pulmonary pathology. No further clinical action was ordered by Dr. Lockett arising from her review of his chart.

59.    After being held in the jail's joint processing facility, Kristopher was transferred to a cell in the jail's 1200 Baker Street facility on January 4, 2025.

60.    On January 4, 2025, Classification Officer Paul Cormier conducted Kristopher's primary classification assessment. The classification system generated an affirmative flag that Kristopher had "Known past/present institutional behavior problems," reflecting his extensive documented history at the Harris County Jail dating back to 2019. Despite this flag, Officer Cormier added no high-risk designations and no special conditions to the booking, and entered "No high risks or special conditions added to this booking" in the relevant field. Officer Cormier assigned Kristopher to Medium security housing and set his next classification review date for March 5, 2025, which was six weeks after Kristopher's death. No medical flag, no mental health flag, and no protective designation of any kind was noted. The classification system available to Officer Cormier at the time contained Kristopher's full institutional history, none of which prompted any special condition or escalation.

61.    On January 4, 2025, NP Fidelia Osifo-Selormey conducted Kristopher's initial health assessment at the jail's joint processing clinic. Her note documents that Kristopher was "uncooperative and unwilling to listen to provider or get any treatment" and that he "stated that he wants to sign a refusal of treatment." NP Osifo-Selormey's assessment recorded his active problem list including schizophrenia, underweight status, dehydration, subacute cough, primary polydipsia, chronic fatigue, physical deconditioning, and adjustment disorder. Despite this

documented history, NP Osifo-Selormey assessed his general condition as "Good" and his general status as "Stable," entered a plan limited to blood pressure checks for five days, and discharged him from the clinic. No mental health referral was entered. No nutritional intervention was ordered. No escalation arising from his documented history of malnutrition and failure to thrive was initiated.

62.    On January 5, 2025, NP Kenneth O. Ihaza conducted a mental health front-door evaluation with Kristopher at the mental health unit.

63.    Upon reviewing Kristopher's chart, NP Ihaza was made aware of his documented history of schizophrenia, his prior hospitalizations for malnutrition and failure to thrive, his seventeen-month refusal of psychiatric medication, and the clinical findings from his 2024 incarceration. This included an August 2024 notation that his condition was "Deteriorating" and that a court-ordered medication hearing should be considered.

64.    On January 5, 2025, NP Kenneth O. Ihaza noted that Kristopher appeared unkempt with unkempt hair, guarded in attitude, and in denial regarding his mental illness, and that he was exhibiting poor judgment. Kristopher denied having any mood or psychotic symptoms and stated he did not take psychiatric medications and was not interested in taking them. NP Ihaza's mental status examination recorded his insight as "Denial" and his judgment as "Poor."

65.    During the same January 5, 2025 encounter, NP Ihaza completed a formal capacity assessment and affirmatively noted that Kristopher showed signs that his perception of reality was being distorted by hallucinations or delusions, and that he was experiencing a mood disturbance. Despite these findings, NP Ihaza's only response was to order psychoeducation.

66.     NP Ihaza's January 5, 2025 referral order — the only clinical action taken as a result of his visit — stated: "Please assist with psychoeducation." This referral was entered at 12:53 AM on January 5, 2025, and assigned a see-by date of January 12, 2025. The referral did not flag Kristopher as requiring urgent mental health assessment, did not request prescriber evaluation, and did not initiate any monitoring of his food intake, vital signs, or physical condition.

67.     Upon information and belief, NP Ihaza was the prescribing clinician with authority to initiate psychiatric medication or seek a court-ordered medication evaluation. He did neither.

68.     Despite NP Ihaza and Harris Health staff's awareness of Kristopher's history and symptoms, staff did not take adequate steps to ensure Kristopher had access to medical care.

69.     On January 12, 2025, six days later, a clinician visited Kristopher in his cell and reported that he was uncooperative and agitated, and that he refused to consent to treatment.

70.     Dr. Elizabeth M. Thoyakulathu was the physician who conducted the January 12 visit and reviewed Kristopher's active problem list, which documented nine conditions: schizophrenia, underweight status, chest pain, subacute cough, primary polydipsia, chronic fatigue, physical deconditioning, dehydration, and adjustment disorder.

71.     On January 12, 2025, Physician Elizabeth M. Thoyakulathu saw Kristopher for a blood pressure re-evaluation. Despite his active problem list, Dr. Thoyakulathu concluded that because his blood pressure was within normal range, "no further intervention will be pursued or evaluation will be needed," and discharged him from the clinic. She entered no weight monitoring order, no food intake plan, no respiratory follow-up, no medical evaluation follow-

16

up, and no mental health referral. She was the last physician to document a clinical encounter with Kristopher before his death.

72.    Dr. Laxman Sunder, MD was the attending physician of record for Kristopher's entire January 2, 2025 through January 30, 2025 incarceration. As the attending physician of record, Dr. Sunder bore supervisory medical responsibility for Kristopher's care throughout this period. Despite this Dr. Sunder made no clinical note, no order, and no documented intervention at any point during the twenty-eight days of Kristopher's 2025 incarceration. This includes the twelve days between January 17 and January 29 during which Kristopher received no documented clinical attention of any kind.

73.    During his 2025 incarceration, Kristopher was also unable to maintain basic hygiene and was frequently threatened by other inmates due to his lack of showering. Such incidents were reported by detention officers on January 10, 12, 14, and 15.

74.    On January 12, 2025, Detention Sergeant Lori Jefferson personally responded to and supervised an incident in which Kristopher activated the two-way communication device in his cellblock and reported to responding officers that his life was in danger and that he had been repeatedly threatened by fellow inmates. Sergeant Jefferson arrived on scene, directed the response, gave Kristopher the opportunity to identify the inmates who had threatened him, oversaw his removal to a holding cell, and supervised the involved officers' handling of the incident.

75.    Sergeant Jefferson had direct personal contact with Kristopher during this encounter. At the time, Kristopher's schizophrenia diagnosis, nine-item active problem list, and documented history of mental health decompensation were accessible in the HCSO system. Despite this direct contact with a known mentally ill detainee who had communicated fear for his

17

life, Sergeant Jefferson made no mental health referral, took no steps to ensure Kristopher received a clinical evaluation following the incident, and filed no mental health notification of any kind. This was the second threatening incident involving Kristopher within three days, and the third time in the January 2025 incarceration that officers had documented hygiene-driven threats against him without generating any clinical response.

76.     Staff were aware of these incidents and Kristopher's continued inability to properly care for himself or provide for his own basic needs.

77.     On January 15, 2025, Kristopher was seen by another clinician who reported that he displayed the inability to fully advocate for himself due to his mental illness.

78.     The January 15, 2025 encounter was conducted by Lakeshia D. Green, Care Coordinator. Ms. Green's note states: "pt continues to display limited insight/judgement, inability to advocate fully for himself, and barriers to social adaption in GP housing placing him at a higher risk for victimization." Ms. Green further documented that Kristopher remained "in denial about his mental illness" and showed "poor judgement by refusing MH treatment." The visit lasted ten minutes.

79.     Ms. Green's formal capacity assessment recorded that there were signs his perception of reality might be distorted by hallucinations or delusions and that he showed signs of a mood disturbance. She further noted he remained unable to identify coping strategies.

80.     Despite these observations, Ms. Green's plan was a Step Down Unit housing transfer. No modification to Kristopher's medical care plan was made. No proactive clinical monitoring or health assessment was ordered. No food or fluid intake tracking was initiated. No escalation to a prescribing provider was entered. The written finding that Kristopher could not advocate for himself was filed in his chart and no provider took action on it.

18

81.    Despite documenting these symptoms and Kristopher's evident difficulty accessing nourishment and medical care, the Ms. Green did not take steps to ensure Kristopher had access to those services or otherwise provide him with medical treatment.

82.    On January 17, 2025, Kennedi Harris, LMSW, conducted a mental health follow-up assessment with Kristopher in the Step Down Unit. Kristopher again denied any mental health or medical concerns.

83.    Ms. Harris documented that Kristopher "did present to be internally preoccupied or responding to internal or external stimuli," that he showed "low speech, flat affect and unable to maintain direct eye contact," and that he was "unable to maintain direct eye contact with the provider during the session." Ms. Harris recommended that Kristopher remain in Step Down housing "for closer monitoring and stabilization." Her visit lasted five minutes.

84.    Less than four hours later, Elizabeth Anderson, LMSW signed a discharge summary discharging Kristopher from the Step Down Unit to the general population.

85.    Ms. Anderson's note references his next scheduled court date of March 6, 2025 and states that "a releasing packet is not required at this time." The discharge was co-signed by Regenia Roach at 3:23 PM. Ms. Anderson's and Ms. Roach's discharge eliminated the only remaining structured monitoring framework in place for Kristopher.

86.    January 17, 2025 was the last date on which any clinical provider documented any contact with Kristopher McGregor.

87.    From January 17 through January 29, 2025 — a period of twelve days — Kristopher received no documented medical or mental health welfare checks, no vital signs, no food or fluid intake monitoring, and no clinical assessments of any kind. This gap occurred while Kristopher's active problem list carried nine documented conditions including dehydration,

underweight status, and subacute cough, while a clinical note from January 15 documented in writing that he was unable to advocate for himself, and while Dr. Laxman Sunder, MD remained the attending physician of record with supervisory responsibility for his care.

88.    During this twelve-day period, a treatable streptococcal infection spread untreated through Kristopher's bloodstream.

89.    Strep throat is a common illness that does not pose a serious threat to life if it is treated adequately and promptly. Such treatment is typically inexpensive, easy to administer, and minimally invasive.

90.    However, due to his severe mental illness, Kristopher lacked the ability to request care.

91.    Despite the knowledge that Kristopher's mental illness prevented him from seeking medical care for himself, at no time did any jail or medical staff implement or provide reasonable modifications and accommodations necessary for Kristoper to access and obtain care.

92.    As Kristopher's mental health continued to deteriorate, his physical health did as well.

93.    Staff knew that Kristopher had previously been hospitalized because of food refusal, malnourishment, dehydration, and other medical deficiencies related to his serious mental illness and diminished capacity. Given this well-documented history, Defendants knew that Kristopher's food refusal would pose a serious risk to his life.

94.    At all times relevant, staff understood that Kristopher's decompensation as it related to his serious mental illness was so severe that he required a level of mental health treatment that they were incapable of providing.

20

95.    At all times relevant, staff understood that Kristopher's mental-illness-driven decompensation inhibited his ability to access medical care and that he required an accommodation to make medical care available to him.

96.    At all times relevant, defendants understood that if Kristopher did not receive adequate mental health care for his serious mental illness, he was at serious risk of harm or death.

97.    At all times relevant, jail and medical staff understood that Kristopher's decompensation as it related to his serious mental illness was so severe it required him to be treated by medical providers and/or at a medical facility with a higher level of mental health care, such as a secure mental health hospital or clinic.

98.    In his malnourished state, Kristopher was uniquely vulnerable to increased risks associated with the infection.

99.    During his detention it was obvious to staff that Kristopher suffered from one or more serious medical conditions and that he required medical attention.

100.    During this time it was obvious to staff that Kristopher's medical condition was rapidly deteriorating.

101.    During this time defendants understood Kristopher's severe mental illness and physical weakness would preclude him from caring for himself or advocating for his medical needs as his medical condition continued to deteriorate.

102.    During this time defendants understood that if they did not take affirmative steps to provide medical treatment to Kristopher and/or facilitate his access to medical care, he was at serious risk of death or other significant bodily injury.

103.    During this time defendants understood that Kristopher's medical condition had become so severe that he required a level of medical care that staff at the jail were not capable of providing.

104.    During this time defendants understood that Kristopher needed to be taken to a medical facility that provided a higher level of care, such as a hospital.

105.    Staff who saw Kristopher failed to take reasonable steps to treat Kristopher and/or facilitate his access to adequate medical care for him.

106.    Despite knowing of Kristopher's inability to request help, as well as his deteriorating physical health, staff failed to take steps to make medical assessments available to Kristopher.

107.    Staff also failed to perform adequate medical assessments or treatment for Kristopher.

108.    Staff failed to provide continuity of care, failed to respond to evident signs of mental and physical deterioration, and failed to implement measures necessary to address Kristopher's escalating risk of dehydration, malnutrition, infection, and respiratory illness.

109.    The delay in providing access to medical care, and the inadequacy of care Kristopher received, allowed the streptococcal infection to spread throughout Kristopher's body.

### 3. Kristopher's death.

110.    On the morning of January 29, 2025, Kristopher was found on the floor of his cell with shallow breathing.

111.    He was taken to the jail clinic at 9:48 AM, where he continued to experience respiratory distress.

112.    At 10:47 AM he was transported to Ben Taub Hospital and admitted to the intensive care unit.

113.    At the hospital, Kristopher's vitals were abnormal, and he appeared severely malnourished and dehydrated.

114.    He experienced acute mental distress and was incoherent, combative,

115.    and disoriented.

116.    Tests revealed that the streptococcal infection had entered his bloodstream, causing septic shock and toxic shock syndrome.

117.    The infection had spread throughout Kristopher's body and his kidneys had started to fail.

118.    His throat had closed, and he was intubated due to continued respiratory failure.

119.    In the evening of January 30, 2025, Kristopher went into cardiac arrest. At 6:41 PM he was pronounced dead.

120.    He was thirty-nine years old at the time of his death.

121.    During the course of the foregoing events and his incarceration at Harris County Jail, Kristopher suffered severe physical and emotional pain and distress.

**4. The HCJ Entities' policy and practice of failing to provide adequate medical and mental health care to detainees in Harris County Jail.**

122.    Throughout his incarceration at the jail, Defendants were on actual and/or constructive notice of Kristopher's serious medical needs and mental disability yet failed to take appropriate action.

123.    At all times relevant to the events at issue in this case, the HCJ Entities and the Supervisor Defendants were responsible for the creation, implementation, oversight, and

23

supervision of policies, practices, and procedures regarding the provision of medical and mental healthcare care to people custody at Harris County Jail.

124. HCJ Entities and the Supervisor Defendants were responsible for ensuring that detainees receive adequate medical and mental health care.

125. Defendant Naomi Lockett, as the medical director of Harris County Jail and Harris Health, was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

126. Upon information and belief, Defendant Lockett performed her duties on-site at the jail, and observed and/or interacted with Kristopher between January 15, 2025, and January 29, 2025.

127. Defendant Harris Health provided medical and mental health care services to detainees at HCJ pursuant to a contractual arrangement with Harris County. In this capacity, Harris Health was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

128. Defendant Esmaeil Porsa, has served as the President and Chief Executive Officer of Harris Health since March 2020 to the present. In his capacity as President and CEO, Dr. Porsa was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

129. Prior to assuming the role of President and CEO of Harris Health, Dr. Porsa served as a member of the Board of Trustees of the National Commission on Correctional Health

Care and as Vice Chair of the Texas Commission on Jail Standards. Dr. Porsa therefore possessed specific, professional expertise in the standards governing constitutionally and statutorily adequate correctional health care before he assumed leadership of Harris Health.

130. Defendant Harris Center provided mental health care services to detainees at HCJ pursuant to a contractual arrangement with Harris County. In this capacity, Harris Center was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

131. Defendant Wayne Young served as the Chief Executive Officer of the Harris Center since approximately 2019. In his capacity as CEO, Mr. Young was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of mental health services to individuals in custody at the Harris County Jail.

132. Defendant O. Reggie Egins served as the Chief Medical Officer of Correctional Health for Harris Health at the time of the events giving rise to this Complaint. In his capacity as Chief Medical Officer of Correctional Health, Defendant Egins was also responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody at the jail.

133. Prior to the events giving rise to Plaintiff's Complaint, the HCJ Entities and the Supervisor Defendants had notice that people in HCJ custody with serious medical needs—people like Kristopher—were routinely denied medical care and access to medical care due to widespread policies and practices by healthcare and correctional staff at HCJ.

134.    Staff at the jail routinely delay or completely ignore the clear symptoms of serious medical needs exhibited by detainees, including those whose medical records reflect an obvious need for treatment.

135.    Despite knowledge of these unlawful policies and practices, the HCJ Entities and the Supervisor Defendants did nothing to ensure that detainees at the jail received adequate medical care and access to medical care, thereby acting with deliberate indifference.

136.    Specifically, there exist widespread policies and practices within Harris County Jail pursuant to which detainees receive unconstitutionally inadequate healthcare. Detention officers and medical personnel, commonly fail or refuse to: (1) take action to secure appropriate continuity of care for complicated and urgent conditions; (2) adequately observe and monitor detainees with known medical and mental health conditions; (3) provide necessary treatment and essential medications; (4) properly examine a detainee with a serious medical condition; (5) respond to detainees who exhibit obvious signs of a serious medical condition or illness; or (6) facilitate access to a higher level of medical or mental health care, such as a hospital, when it becomes apparent that a detainee's needs are beyond the capabilities of the jail staff.

137.    These widespread policies and practices have flourished because the HCJ Entities and the Supervisor Defendants have directly encouraged the type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

138.    In this way, the HCJ Entities and the Supervisor Defendants violated Kristopher's rights by maintaining policies and practices that were the moving force behind the foregoing constitutional violations.

139.    The above-described practices, so well-settled as to constitute de facto policy within the Harris County Jail, were able to exist and thrive because the HCJ Entities and the Supervisor Defendants were deliberately indifferent to the problem, thereby effectively ratifying it.

140.    Because these policies and practices were implemented and carried out at the jail, the HCJ Entities and the Supervisor Defendants were aware of them as well, but they failed to take reasonable steps to stop them, effectively adopting a policy of indifference and tacit approval.

141.    The unconstitutional acts that ultimately resulted in Kristopher's death were done in accordance with the official policies and widespread practices of the HCJ Entities and the Supervisor Defendants.

### 5. Example incidents and occurrences.

142.    The following are examples of such policies in practice, and their tragic results:

143.    In 2013, a whistleblower notified a jail compliance team that jail staff had subjected Terry Goodwin—a pretrial detainee at HCJ with a documented history of mental illness—to horrific living conditions. Upon visiting his cell, the compliance team found Mr. Goodwin filthy and wearing a shredded jail uniform, pieces of which were hanging from the ceiling where he had attempted to hang himself. The cell was infested with bugs and covered in trash, and his sink, toilet, and shower were clogged with feces and toilet paper. HCJ staff had not conducted observation of Mr. Goodwin outside of officers dropping off meals, and had not opened his cell in months, as instructed by a sign on the door not to open the cell. Officers, supervisors, medical staff, and administrators at the HCJ knew about the conditions Mr. Goodwin was being kept in, yet did nothing to intervene. Because HCJ staff kept him in these

conditions and denied him care, his mental health deteriorated severely. HCJ staff only removed Mr. Goodwin from his cell and placed him in a mental health facility after he was discovered by whistleblowers. Harris County subsequently settled the resulting civil rights lawsuit, and two detention sergeants were criminally indicted for tampering with government records by falsely certifying that Goodwin's cell had been inspected and that he was in good condition.  These events led to a lawsuit against Harris County and a settlement.

144.    On May 6, 2020, Wallace Harris, an inmate at the HCJ, died due to an ongoing medical condition that staff failed to treat. Mr. Harris had a known history of hypertension and required ongoing medication and treatment. During his time at the jail, HCJ staff did not provide him with adequate medical screening or care. On May 6, 2020, he was discovered unresponsive on the floor of his cell with shallow breathing. After being taken to the hospital, he was declared deceased. HCJ staff's failure to properly observe and monitor Mr. Harris drove inadequate and untimely medical care that ultimately resulted in his death.

145.    On September 13, 2020, David Perez, an inmate at the HCJ, was found unresponsive in his cell. He was transported to the hospital and declared deceased on September 15, 2020. His cause of death was medically undetermined. HCJ staff's failure to properly observe and monitor Mr. Perez and conduct face-to-face observations drove inadequate and untimely medical care that ultimately resulted in his death.

146.    On February 8, 2021, Israel Lizano Iglesias died shortly after being admitted to the HCJ. Staff placed him in a holding cell and failed to adequately observe him. As a result, he did not receive medical care for his known ongoing condition. Other detainees informed jail staff that Mr. Iglesias needed medical attention. Only then was he transported to the hospital, where he died shortly after.

28

147. On May 11, 2021, Roy Ward Jr., an inmate at HCJ, was found slumped over in his cell. Mr. Ward had been assaulted by another inmate several days earlier and punched in the head six times. HCJ staff provided Mr. Ward with minimal treatment for his injuries and no diagnostic examinations. Staff placed him back in his cell without any further medical attention and failed to monitor him adequately in light of his known injuries. Shortly after staff discovered him unresponsive in his cell on May 11, he was taken to the hospital and pronounced deceased due to blunt force head trauma. His family subsequently filed a federal civil rights lawsuit against Harris County and Sheriff Gonzalez, alleging that the sheriff's repeated refusal to adhere to state requirements regarding inmate monitoring directly resulted in Rory's death.

148. On or about July 2021, Kelvin Jones, a detainee at Harris County Jail, was physically assaulted by another incarcerated individual while correctional officers stood by without intervening. When he was brought to medical staff following the assault, a nurse attempted to pressure him into falsifying his medical records. HCJ staff's failure to provide Mr. Jones with adequate medical documentation of his injuries reflected the jail's pervasive disregard for the medical needs of detainees in their custody.

149. On August 28, 2021, HCJ staff found Gregory Barrett, an inmate at HCJ, dead on the floor of his cell. Mr. Barrett was booked into HCJ with known pre-existing medical conditions. On August 26, he reported to his wife that he did not feel well and was vomiting blood. The next day, he was still vomiting blood and had not received any medical attention despite the obvious need for such. Officers did not properly monitor Mr. Barrett and he was found dead in his cell.

150. In December 2021, Evan Lee, a detainee at Harris County Jail with documented mental illness, was booked into the jail and immediately began experiencing difficulty obtaining

29

the psychiatric medication he required. His family reports that he visibly deteriorated during his incarceration as a result of the failure to provide him with his necessary medication. On March 9, 2022, he was badly beaten by a fellow inmate. Despite visible injuries, jail staff failed to provide him with timely medical care. More than a week after the assault, staff finally transported him to a hospital, where doctors discovered serious head injuries including two areas of bleeding in his brain. He was pronounced brain-dead two days later. The Harris County medical examiner ruled his death a homicide. His mother subsequently filed a federal civil rights lawsuit against Harris County alleging that the failure to provide adequate mental health medication and the failure to monitor and respond to his deteriorating condition after the assault caused his death.

151.    In January 2022, Simon Peter Douglas, a detainee at Harris County Jail who suffered from serious mental illness, died after sustaining fatal injuries while in custody. During his detention, Mr. Douglas displayed signs of psychotic agitation from the time of his arrest. Despite these obvious signs of acute psychiatric crisis there is no indication that jail staff ever administered emergency psychiatric medication or provided him with adequate mental health intervention. Staff failed to respond appropriately as his condition deteriorated, and only transported Mr. Douglas to the hospital after he had already sustained fatal injuries. He was pronounced dead at the hospital. The medical examiner recorded his cause of death as blunt force cephalocervical trauma.

152.    In March 2022, Damian Lopez, contracted COVID-19 during his detention at HCJ. His family was not notified that he had been hospitalized until he was already unconscious and on a ventilator. Rather than report his impending death as an in-custody death, officials released Mr. Lopez from custody while he lay dying. The maneuver that had the effect of removing his death from the jail's official death toll. He died two days later.

153.    In March 2022, Matthew Shelton, HCJ staff failed to provide him with the insulin he required to survive. Five days after his arrival, he was found dead in his cell. HCJ staff's failure to provide a diabetic detainee with his necessary medication — a basic, inexpensive, and well-understood medical need — resulted in a wholly preventable death. His family subsequently filed a federal civil rights lawsuit against Harris County alleging deliberate indifference in the failure to provide him with the medication his doctor had ordered and that he required to survive.  These events are the subject of a lawsuit against Harris County.

154.    In March 2022, Evan Griffin, while detained at HCJ was beaten by another incarcerated individual and sustained a critical brain injury. Despite visible injuries including facial bruising, jail staff failed to provide Mr. Lee with any medical care for two days following the assault. When medical staff finally saw him, they looked at him and returned him to his cell without treatment, observation, or diagnostic testing. Only after Mr. Lee's condition became overtly alarming — more than a week after the assault — did jail staff transport him to a hospital, where he was pronounced dead on March 22, 2022. These events are the subject of an ongoing lawsuit against Harris County.

155.    On May 20, 2022, Kristan Smith, an inmate at the HCJ, was found unresponsive in her bunk. Ms. Smith had a known history of diabetes and blood pressure issues and required medication for both conditions. However, staff failed to provide Ms. Smith with her necessary medication in a timely and consistent manner. Officers failed to properly observe or monitor Ms. Smith and failed to notice when she started suffering a medical emergency in her cell. Other detainees notified staff when she became unresponsive. On May 28, 2022, Ms. Smith was declared deceased due to the failure to receive her diabetes medication.

31

156.    On July 31, 2022, detention officers found Jim Franklin Lagrone, an inmate at the HCJ, vomiting into his toilet. Despite HCJ staff's awareness of Mr. Lagrone's history of drug usage and recent arrest for drug possession, HCJ staff did not screen him for medical care upon intake, nor did they provide him with any medical care after observing that he was ill in his cell. A few hours later, he was discovered unresponsive and declared deceased shortly after.

157.    On August 30, 2022, Willie Fizer died in the intake room of Harris County Jail. No information was provided by the jail regarding the manner or cause of his death. The circumstances surrounding Mr. Fizer's death — including the absence of any incident report explaining how a person died in the jail's own intake area — reflected the jail's longstanding practice of concealing and failing to account for in-custody deaths.

158.    On or about September 9, 2022, Antonio Scoggins, a detainee at Harris County Jail, was assaulted by a group of correctional officers and suffered injuries severe enough to require emergency hospitalization. Mr. Scoggins filed a grievance following the assault. Despite this filing and the seriousness of his injuries, jail staff took no remedial action. HCJ staff's failure to respond to Mr. Scoggins' grievance or discipline the officers responsible for his injuries demonstrated the jail's entrenched culture of impunity for staff violence against detainees.

159.    On October 1, 2022, Bryan Marquis Johnson, an inmate at HCJ, suffered a medical emergency and was pronounced dead shortly after. Mr. Johnson had previously reported to his mother that he was experiencing shortness of breath in the jail. He visited the clinic several times but HCJ staff did not provide him with adequate treatment. As his condition worsened, his mother began calling officials and staff at the jail to beg them to provide her son with adequate medical care. She reported that they refused to do anything. On October 1, 2022, she was

notified that her son had suffered a medical emergency and died. His official cause of death was an inflammatory disease which is often easily treatable with steroids.

160.    In 2023, during his detention at HCJ, Charles Miller reported that correctional staff engaged in a practice of punitive medication denial: when any individual in a housing tank misbehaved, medical staff withheld medication from all detainees in that tank as a collective punishment. Mr. Miller himself suffered from anemia and other medical conditions for which he received no adequate follow-up treatment.

161.    In 2023, during his detention at HCJ, Robert Rios reported that he was denied necessary medication and medical treatment, with jail staff attributing the delays to overcrowding. Mr. Rios also reported receiving threats from correctional officers and witnessing repeated instances of excessive force by staff.

162.    The foregoing incidents involving Jones, Barrett, Griffin, Smith, Scoggins, Johnson, Miller, and Rios, among others, became the subject of a 231-page federal class action lawsuit filed in August 2023 on behalf of 22 families and former detainees, alleging that Harris County and the Harris County Sheriff's Office had deliberately and persistently neglected their custodial responsibility to keep people in the jail safe, and that a pervasive pattern, practice, and culture of assault, death, and failure to provide care had been allowed to flourish without accountability.

163.    In January 2023, Troy Roy Salinas, a 55-year-old man with stage 4 cancer who had previously undergone kidney removal surgery, was booked into HCJ. Mr. Salinas also suffered from serious mental illness; at the time of his arrest he was experiencing a psychotic episode in which he believed police officers were aliens. Despite being transported by ambulance, he was taken directly to jail rather than to the hospital for psychiatric evaluation.

33

While detained, Mr. Salinas was denied the cancer medications he required to manage his stage 4 diagnosis, which was a life-threatening deprivation given the severity of his illness and his single remaining kidney. His nutritional needs were similarly ignored: despite being housed in the infirmary with a documented cancer diagnosis, he was provided only two oranges per day as food, an amount wholly inadequate for a medically compromised patient. During his detention he was assaulted by three other incarcerated individuals and sustained a fractured jaw, for which he received no adequate follow-up care. HCJ staff's response to a terminally ill man in active psychosis was neglect at every turn.

164.    On May 16, 2023, Robert Terry Jr., an inmate at HCJ, suffered a medical emergency in his cell. He called for help by pressing the intercom button in his cell shortly before falling to the floor. He began to foam at the mouth and attempted to crawl to the dayroom to get help. Staff failed to promptly respond to Mr. Terry's request for medical attention. When they arrived 90 minutes later, they did not attempt to render aid but instead laughed and taunted Mr. Terry. He passed away later that morning as a result of his failure to obtain medical care. His family subsequently filed a federal civil rights lawsuit against Harris County alleging deliberate indifference by jail staff in failing to provide him with adequate medical care following the assault and in the days leading up to his death. These events are the subject of a lawsuit against Harris County.

165.    In July 2023, Ramon Thomas, a 30-year-old detainee at Harris County Jail diagnosed with schizophrenia and bipolar disorder, died in custody after jailers failed to provide lifesaving measures during a medical emergency. His mother, Dianne Bailey-Rijsenburg, publicly condemned the incarceration of mentally ill individuals at the Harris County Jail and the jail's failure to provide adequate mental health care, stating that mental health care and

incarceration "does not work" and "does not go together." His death was among five deaths of previously identified mentally ill detainees at the Harris County Jail in the first half of 2023 alone.

166.   In October 2023, Alan Kerber, a 34-year-old detainee at Harris County Jail, died after attempting to take his own life. Mr. Kerber had a known mental health condition requiring monitoring and intervention, yet jail staff took no steps to ensure his mental health needs were met during his detention. His family subsequently filed a federal civil rights lawsuit against Harris County alleging deliberate indifference by jail staff in failing to monitor and respond to his mental health crisis.  These events are the subject of a lawsuit against Harris County.

167.   In October 2023, Victoria Simon, a 42-year-old detainee at Harris County Jail, died in custody. Ms. Simon had documented medical needs during her detention that jail staff failed to adequately monitor or address. Her family subsequently filed a federal civil rights lawsuit against Harris County alleging deliberate indifference by jail staff in failing to monitor and respond to her deteriorating condition.

168.   In April 2024, HCJ detainee John Hackl experienced respiratory symptoms that jail staff failed to adequately monitor or address. On May 24, 2024, he was found unresponsive on the floor of his cell and transported to the hospital, where he was placed on life support. He died on June 18, 2024, from a pulmonary embolism. His widow subsequently filed a federal civil rights lawsuit against Harris County alleging that jail staff ignored his persistent respiratory symptoms for weeks, that he lay on the floor of his cell for nearly two hours before help was called, and that the jail released him from custody while he was unresponsive at the hospital in order to avoid a mandatory Texas Rangers investigation into his death.

169.    In later half of 2024, an unnamed detainee at Harris County Jail was diagnosed with stage 4 cancer requiring chemotherapy. Despite his documented diagnosis and known need for ongoing treatment, jail staff denied him chemotherapy for a period of approximately four months. During that time, his cancer spread to his lungs.

170.    In the later half of 2024, an unnamed detainee at Harris County Jail, approximately 60 years old, had been held in custody for over a month with a cardiac defibrillator. During his detention, jail staff failed to monitor, service, or account for his defibrillator for the entirety of his incarceration — leaving him without any assurance that the device keeping his heart functioning was operational.

171.    In early 2025, an unnamed detainee at Harris County Jail sustained severe injuries to his calf during his arrest, including wounds requiring a skin graft. Despite the severity and urgency of his injuries, jail staff delayed the necessary surgery for months. The surgery was only approved after his family contacted the Texas Jail Project and sought outside intervention. During the delay, jail staff repeatedly denied the detainee's requests for basic wound care. As a result of the failure to provide adequate wound care, a boil formed at the wound site and the skin graft ultimately failed. Following the failed graft, the detainee developed debilitating complications including extreme nerve pain, numbness, vision problems, and loss of mobility so severe that he was at times unable to walk or lie down. Despite these worsening symptoms, jail staff dismissed his repeated requests for an MRI, nerve study, and physical therapy. Upon information and belief, on July 25th, after multiple complaints from the detainee, Dr. Laxman Sunder confronted the detainee stating "[p]eople who went against me are dead. People who are going to die can't beat me. Tell your people you are fine. No more complaining."

172.    In July 2025, Aljolison Blaylock III, a detainee at Harris County Jail, was denied adequate dialysis treatment during his incarceration. Specifically, medical staff were not providing Mr. Blaylock's with his full dialysis treatments, were unresponsive to his complaints, and failed to treat an untreated skin condition that he feared would develop into a serious infection. Following a dialysis session, Mr. Blaylock experienced dangerously low blood pressure, after which staff attempted to administer high blood pressure medication, which was the opposite of what his condition required. Mr. Blaylock communicated to his wife that he feared dying in the jail because medical staff appeared indifferent to and incapable of managing his serious medical needs.

173.    On August 8, 2025, Howard Ruffin was attacked and choked by a fellow detainee who had been identified as a psychiatric patient at HCJ's 1200 Baker Street facility, an assault witnessed by a supervising sergeant on surveillance camera in real time. Despite the documented nature of the attack, jail staff denied Mr. Ruffin medical care for the neck and back injuries he sustained, and he had received no medical treatment as of the time he reported the incident.

174.    In September 2025, Sinia Johnson, a Type 1 diabetic detainee at HCJ, was denied adequate medical care for her serious and life-threatening conditions. Ms. Johnson suffered from Type 1 diabetes, high blood pressure, significant vision impairment, and mental health conditions. While detained, she experienced seizures and dangerously low blood sugar episodes on a daily basis. Jail staff refused to allow her to monitor her own blood glucose levels — a basic and essential component of Type 1 diabetes management — despite the known and obvious risk that unmonitored blood sugar poses to a diabetic patient's life. Staff were reported to deliberately ignore her medical needs. Her daughter submitted multiple inmate concern forms on her behalf, none of which produced any remedial response from jail staff.

37

175.    In 2025, Tan Goldade, a 31-year-old detainee at Harris County Jail, was arrested and booked into the jail on a charge of assaulting a peace officer. He was subsequently found incompetent to stand trial and placed in the jail's internal Jail Based Competency Restoration Program. Only fifteen days after entering the program, Goldade was discharged back into the general jail population. On or about April 2026, Goldade suffered a medical emergency while in custody and died.

176.    Beginning in May 2025 and continuing through at least January 2026, Bubacarr Conteh, a pretrial detainee and gunshot survivor with permanent paralysis of his right arm, a missing kidney, liver damage, a traumatic brain injury, and permanent dependence on a colostomy bag, was denied the medical care his conditions required. Despite these severe and documented needs, jail officials removed him from the medical infirmary and placed him in general population, where medical staff refused to assist him with colostomy bag management despite his paralyzed arm making independent management impossible. By October 2025, his colostomy bag had ruptured and was actively leaking fecal matter; staff refused repeated requests for a replacement bag, leaving him at serious risk of infection and sepsis for months. Formal complaints to the Texas Commission on Jail Standards and Sheriff Gonzalez's office produced no remedial response — demonstrating that nearly a year after Kristopher McGregor's death, the jail's deliberate indifference to serious medical needs remained wholly unremedied.

**6. Defendants were repeatedly put on notice of the HCJ Entities' unconstitutional policies and practices.**

177.    In 2008, the conditions of the Harris County Jail received national attention when the Department of Justice investigated the jail for constitutional violations.

178.    The DOJ found in 2009 that there were systemic deficiencies throughout the jail that violated the constitutional rights of detainees. Specifically, they found that the jail failed to

38

provide detainees with adequate medical care, mental health care, protection from serious physical harm, and protection from life safety hazards.

179.    Since then, Harris County has not adequately addressed these conditions, and they remain persistent in the jail.

180.    When Defendant Gonzalez was elected Sheriff of Harris County in 2016, he was aware of the history of unconstitutional conditions and treatment of inmates at Harris County Jail.

181.    The Texas Commission on Jail Standards ("TCJS") is a regulatory body that oversees and monitors jails in the state to ensure that those incarcerated receive humane treatment. TCJS has found the Harris County Jail to be out of compliance with state standards almost twice per year since 2018. A selection of these notices are detailed below:

182.    In March of 2016, TCJS issued a notice of noncompliance due to Harris County's failure to provide medical services to a detainee despite the detainee making five different medical requests, which spanned over the course of an entire month.

183.    On December 9, 2020, TCJS issued an annual inspection report finding the jail noncompliant in multiple areas. Specifically, HCJ staff were filling out mental health screening forms incorrectly and were failing to conduct timely face-to-face observations of inmates, which resulted in the failure to provide sufficient and timely medical care.

184.    On April 5, 2021, TCJS found that Harris County was still noncompliant with minimum observation requirements at the jail, resulting in the failure to provide sufficient and timely medical care to inmates.

185.    By October 2022, 27 people had already died in Harris County Jail custody that year alone. The highest number since 2006. Despite this alarming death rate, HCJ Entity officials took no meaningful steps to address the underlying systemic deficiencies driving these deaths.[2]

186.    On December 19, 2022, TCJS issued a notice of noncompliance following a special inspection regarding the in-custody death of Matthew Shelton. Mr. Shelton passed away in March 2022 while in HCJ custody due to staff's failure to provide medication for his known medical conditions. Despite being given a doctor's order explaining that Mr. Shelton's access to such medication was essential for his survival, jail staff withheld the medication. TCJS found that Harris County failed to provide, proscribe, or follow doctor's orders for providing medication to inmates like Mr. Shelton, despite being required to do so.

187.    On March 8, 2023, TCJS issued a report finding that Harris County continued to be in noncompliance with their requirement to provide sufficiently and timely medical care to detainees. Specifically, TCJS found that HCJ staff was failing to ensure that detainees were seen within 48 hours after submitting medical requests.

188.    On February 20, 2024, TCJS issued a report finding that HCJ was still in noncompliance with minimum observation requirements, having also been in noncompliance with this standard in August of 2023. Specifically, the report noted that in January of 2024 alone, staff failed to meet observation frequency requirements approximately 1400 times.

---

[2] Community Impact, "Harris County Jail population, deaths swell in 2022," January 31, 2023, *available at*: https://communityimpact.com/houston/bay-area/city-county/2023/01/26/harris-county-jail-population-deaths-swell-in-2022/

189.    On January 13, 2025, TCJS issued a report finding that Harris County was again in noncompliance with minimum observation standards after investigating an in-custody death and discovering that staff were not conducting face-to-face observations as required.

190.    The deaths of detainees at Harris County Jail have continued without abatement. Twenty people died in Harris County Jail custody in 2025 — an increase from the prior year — demonstrating that despite years of documented noncompliance notices, civil rights complaints, and public outcry, Harris County's policymakers have failed to implement any meaningful reforms that would prevent the needless deaths of people in their custody.

191.    Despite being made aware of these life-and-death issues through numerous noncompliance notices and detainee deaths at the jail, Harris County and its policymakers, including Defendants Gonzalez and Lockett, failed to correct systemic deficiencies or make any significant changes in its policies, practices, customs, or culture.

192.    Harris Health and its policymakers, including Defendants Porsa, Lockett and Egins, were similarly on notice of these systemic failures. Despite this notice, Harris Health, Porsa, and Lockett failed to reform the clinical policies and practices that permitted Harris Health staff to observe, document, and file evidence of Kristopher McGregor's deterioration across multiple incarcerations without initiating the interventions that would have saved his life.

193.    Harris Center and its policymakers, including Defendant Young, was similarly on notice of these systemic failures. Despite this notice, Harris Center, Young, and Porsa failed to reform the clinical policies and practices that permitted Harris Center staff to observe, document, and file evidence of Kristopher McGregor's deterioration across multiple incarcerations without initiating the interventions that would have saved his life.

7. **Harris County breached its non-delegable duty to provide people in its custody with adequate medical care.**

194.    As custodians of people detained at the Harris County Jail, Harris County and Sheriff Gonzalez cannot contract away their constitutional and statutory obligations to provide adequate medical and mental healthcare, and they are liable for any unconstitutional or unlawful conduct by Harris Health or Harris Center that resulted in harm to any of their detainees.

195.    Harris County and Sheriff Gonzalez were aware of or on notice regarding the multiple failures to provide medical and mental healthcare at the HCJ yet they continued to employ Harris Health and Harris Center.

196.    Notwithstanding this awareness, Harris County and Sheriff Gonzalez have continued to outsource medical and mental healthcare of HCJ detainees to Harris Health and Harris Center.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 1983 - Against Defendant Harris County

197.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

198.    Official policies and customs existed in the Harris County Jail pursuant to which inadequate medical and mental health care was provided to detainees in the Harris County Jail.

199.    Policymakers for Harris County, the Harris County Sheriff's Office, and the Harris County Jail knew about or were on notice of these policies and customs, as well as their tragic consequences.

200.    These policy makers were deliberately indifferent to said policies and customs.

201.    These policies and customs were the driving force behind the failure to provide adequate medical care to Kristopher, violating his rights, and leading to his suffering and death.

202. Harris County is liable for such damages and attorney fees, costs, and interest under federal law, including 42 § 1983.

## COUNT 2
### 42 U.S.C. § 1983 - Against Defendant Harris Health

203. All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

204. Official policies and customs existed within Harris Health's delivery of medical and mental health care at Harris County Jail pursuant to which inadequate medical care was provided to detainees in the Harris County Jail, including detainees with serious psychiatric conditions and documented medical vulnerability

205. Policymakers for Harris Health, including its President and Chief Executive Officers, Defendant Esmaeil Porsa, M.D., Naomi Lockett, O. Reggie Egins, and Laxman Sunder, knew about or were on notice of these policies and customs, as well as their tragic consequences.

206. These policymakers were deliberately indifferent to said policies and customs.

207. These policies and customs were the driving force behind the failure to provide adequate medical and mental health care to Kristopher, violating his rights, and leading to his suffering and death.

208. Harris Health is liable for such damages and attorney fees, costs, and interest under federal law, including 42 § 1983.

## COUNT 3
### 42 U.S.C. § 1983 - Against Defendant Harris Center

209. Plaintiff incorporates all previous paragraphs as if fully restated here.

210. At all times relevant to this Complaint, the Harris Center for Mental Health and IDD was the entity responsible for administering mental health services to detainees at the Harris

County Jail, including the operation of the mental health front-door evaluation process at the jail's intake facilities.

211.    Official policies and customs existed within the Harris Center's administration of mental health services at the Harris County Jail pursuant to which detainees with serious mental illness were not consistently identified, evaluated, or provided with adequate mental health services.

212.    Policymakers for the Harris Center, including Chief Executive Officer Wayne Young, knew about or were on notice of these policies and customs, including prior findings of noncompliance by the Texas Commission on Jail Standards related to the failure to conduct timely mental health screenings and face-to-face observations of detainees, as well as prior in-custody deaths resulting from inadequate mental health care at the jail.

213.    These policymakers were deliberately indifferent to said policies and customs.

214.    These policies and customs were the driving force behind the failure to provide adequate mental health care to Kristopher, including the failure to conduct the Harris Center Front Door evaluation at his January 2025 intake, the failure to initiate a mental health referral following documented signs of decompensation, and the failure to implement any mental health monitoring or intervention during the twelve-day period preceding his death.

215.    The Harris Center is liable for such damages and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

## COUNT 4
### 42 U.S.C. § 1983 – Against Ed Gonzalez and Naomi Lockett in their individual capacities

216.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

217. Defendants Ed Gonzalez and Naomi Lockett, in their individual capacities, are supervisors of one or more persons who violated Kristopher's rights.

218. Defendant Gonzalez and Defendant Lockett adopted policies that encouraged or were indifferent to the provision of inadequate medical care within Harris County Jail.

219. Defendants Gonzalez and Lockett knew about or were on notice of these policies and customs, as well as the grave risks and tragic consequences they engendered.

220. The numerous in-custody deaths and findings of noncompliance with minimum medical standards by TCJS made it obvious to Defendants Gonzalez and Lockett that without a change to the foregoing policies and customs, incarcerated people like Kristopher would continue to needlessly suffer and die.

221. The foregoing policies and customs caused the violation of Kristopher's rights under federal law and, ultimately, his suffering and death.

222. Defendant Gonzalez and Defendant Lockett ignored the grave risks of the foregoing policies and customs and intentionally chose to maintain policies and customs with deliberate indifference to those risks.

223. Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Kristopher.

224. Defendant Gonzalez and Defendant Lockett are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

## COUNT 5
### 42 U.S.C. § 1983 – Against Defendant Esmaeil Porsa in his individual capacity

225. All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

226. Defendant Esmaeil Porsa, M.D., in his individual capacity, is a supervisor of one or more persons who violated Kristopher's constitutional rights.

227. Defendant Porsa adopted policies that encouraged or were indifferent to the provision of inadequate medical and mental health care within Harris County Jail.

228. Defendant Porsa knew about or was on notice of these policies and customs, as well as the grave risks and tragic consequences they engendered.

229. The numerous in-custody deaths and findings of noncompliance with minimum medical standards by TCJS made it obvious to Defendant Porsa that without a change to the foregoing policies and customs, incarcerated people like Kristopher would continue to needlessly suffer and die.

230. The foregoing policies and customs caused the violation of Kristopher's rights under federal law and, ultimately, his suffering and death.

231. Defendant Porsa ignored the grave risks of the foregoing policies and customs and intentionally chose to maintain policies and customs with deliberate indifference to those risks.

232. Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Kristopher.

233. Defendant Porsa is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

### COUNT 6
### 42 U.S.C. § 1983 – Against Defendant Wayne Young in his individual capacity

234. Plaintiff incorporates all previous paragraphs as if fully restated here.

235. Defendant Wayne Young, in his individual capacity, is a supervisor of one or more persons who violated Kristopher's constitutional rights.

236. As Chief Executive Officer of the Harris Center, Mr. Young was the highest-ranking policymaking official responsible for the administration of mental health services at the Harris County Jail, including the policies and practices governing the identification, evaluation, and treatment of detainees with serious mental illness.

237. Defendant Young adopted policies that encouraged or was indifferent to the provision of inadequate mental health care to detainees with serious mental illness at the Harris County Jail.

238. Defendant Young knew about or was on notice of these policies and customs, as well as the grave risks and tragic consequences they engendered, including through his documented awareness of the Harris Center's role at the jail and the systemic failures in mental health service delivery to the jail population.

239. The numerous in-custody deaths and findings of noncompliance with minimum mental health standards by TCJS made it obvious to Defendant Young that without a change to the foregoing policies and customs, incarcerated people like Kristopher would continue to needlessly suffer and die.

240. The foregoing policies and customs caused the violation of Kristopher's rights under federal law and, ultimately, his suffering and death.

241. Defendant Young ignored the grave risks of the foregoing policies and customs and intentionally chose to maintain policies and customs with deliberate indifference to those risks.

242. Said acts and omissions were undertaken in wanton disregard for the rights and safety of Kristopher McGregor

243.    Defendant Young is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

## COUNT 7
### 42 U.S.C. § 1983 – Against Defendant O. Reggie Egins in his individual capacity

244.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

245.    Defendant O. Reggie Egins, in his individual capacity, is a supervisor of one or more persons who violated Kristopher's constitutional rights.

246.    As Chief Medical Officer of the Harris Health, Mr. Egins was the senior clinical policymaking official responsible for the clinical protocols and medical policies governing the delivery of medical services at the Harris County Jail.

247.    Defendant Egins adopted policies that encouraged or were indifferent to the provision of inadequate medical and mental health care within Harris County Jail.

248.    Defendant Egins knew about or was on notice of these policies and customs, as well as the grave risks and tragic consequences they engendered.

249.    The numerous in-custody deaths and findings of noncompliance with minimum mental health standards made it obvious to Defendant Egins that without reform of the foregoing clinical policies and protocols, incarcerated people like Kristopher would continue to needlessly suffer and die.

250.    The foregoing policies and customs caused the violation of Kristopher's rights under federal law and, ultimately, his suffering and death.

251.    Defendant Egins ignored the grave risks of the foregoing deficient clinical policies and protocols and intentionally chose to maintain them with deliberate indifference to those risks.

252.    Said acts and omissions were undertaken in wanton disregard for the rights and safety of Kristopher McGregor.

253.    Defendant Egins is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

**COUNT 8**
**42 U.S.C. § 1983 –Defendant Laxman Sunder, in his Individual Capacity**

254.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

255.    At all times relevant to this Complaint, Defendant Laxman Sunder, M.D., was the attending physician of record for Kristopher McGregor's final incarceration at Harris County Jail from January 2, 2025 through January 30, 2025.

256.    As attending physician of record, Dr. Sunder bore supervisory medical responsibility for every clinical decision made by subordinate providers caring for Kristopher during that period, including NP Osifo-Selormey, NP Ihaza, Dr. Thoyakulathu, Ms. Green, Ms. Harris, Ms. Roach, and Ms. Anderson. He had the authority and duty to review their decisions, intervene when those decisions were inadequate, and ensure that a patient with Kristopher's documented medical and psychiatric complexity received appropriate continuity of care.

257.    The subordinate providers acting under Dr. Sunder's supervisory authority made a series of clinical decisions that were facially inadequate on the record before them, as described in this Complaint. Each of those decisions was made under Dr. Sunder's authority as attending physician of record and was subject to his review.

49

258.    Despite this supervisory responsibility, Dr. Sunder made no clinical note, no order, and no documented intervention at any point during the twenty-eight days of Kristopher's final incarceration, including the twelve-day period between January 17 and January 29, 2025, during which Kristopher received no clinical attention of any kind.

259.    Dr. Sunder's complete failure to supervise the providers operating under his authority, to review their clinical decisions, or to intervene on behalf of a patient whose chart documented a clear and escalating risk of serious harm constituted deliberate indifference in his supervisory capacity and was a proximate cause of Kristopher's suffering and death.

260.    The foregoing acts and omissions of Defendant Sunder in his supervisory capacity constituted deliberate indifference to Kristopher's serious medical needs in violation of his rights under the Fourteenth Amendment to the United States Constitution.

261.    Said acts and omissions were undertaken in wanton disregard for the rights and safety of Kristopher McGregor.

262.    Defendant Sunder is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

**COUNT 9**
**American with Disabilities Act - Against Defendant Harris County**

263.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

264.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

265.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

266.   To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

267.   Harris County is a public entity as defined in 42 U.S.C. § 12131(1).

268.   As a service, program, or activity, Harris County provides food to detainees at the Harris County Jail.

269.   As a service, program, or activity, Harris County provides drinking water to detainees at the Harris County Jail.

270.   As a service, program, or activity, Harris County makes medical care available to detainees at the Harris County Jail.

271.   At all times relevant to this Complaint, in light of his severe mental illness, Kristopher was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12132(2).

272.   Due to his mental illness, Kristopher was substantially limited in one or more major life activities, including but not limited to his ability to think, care for his basic needs, and communicate with others.

273.   As a pretrial detainee at Harris County Jail, Kristopher was qualified to receive the services and participate in the participation of programs and activities provided by Harris County and the Harris County Jail.

274. As a result of his mental disabilities, he required reasonable accommodations allowing him to access food.

275. As a result of his mental disabilities, he required reasonable accommodations allowing him to access drinking water.

276. As a result of his mental disabilities, he required reasonable accommodations allowing him to access medical care.

277. Under Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

278. Harris County has an obligation to provide modifications to their policies, procedures, and practices if they know or should know that a detainee is disabled and needs a modification.

279. Despite knowing that Kristopher's obvious disability prevented him from understanding his need for treatment and advocating for himself, caring for himself and his basic needs, and thinking clearly and making decisions, including accessing food, water, and medical care, Defendants abided by a continuous policy of discrimination against mentally ill detainees and failed to provide reasonable accommodations which would have enabled him to access food, water, and medical care on an equal basis with non-disabled detainees, such as enhanced monitoring, assisted meal intake, proactive medical rounds and vitals checks, adequate evaluations to determine capacity, or transfer to an outside facility.

280. Due to Defendants' failure to provide Kristopher with reasonable accommodations, Kristopher was deprived of access to food, water, and medical care, ultimately leading to his death.

52

281.    As a result of Defendants' failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners, Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

282.    Harris County is further liable for failures to accommodate by persons or entities with which it has contracted, including Harris Health and Harris Center.

**COUNT 10**
**American with Disabilities Act - Against Defendant Harris Health**

283.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

284.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

285.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132

286.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

287.    Harris County is a public entity as defined in 42 U.S.C. § 12131(1).

288.    Harris County Hospital District d/b/a Harris Health System is a public entity as defined in 42 U.S.C. § 12131(1), as a political subdivision of the State of Texas created pursuant to Chapter 281 of the Texas Health and Safety Code.

289.    As a service, program, or activity, Harris Health provides medical and mental health care to detainees at the Harris County Jail.

290.    At all times relevant to this Complaint, in light of his severe mental illness, Kristopher was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

291.    Due to his mental illness, Kristopher was substantially limited in one or more major life activities, including but not limited to his ability to think, care for his basic needs, and communicate with others.

292.    As a pretrial detainee at Harris County Jail, Kristopher was qualified to receive the services and participate in the programs and activities provided by Harris Health.

293.    As a result of his mental disabilities, he required reasonable accommodations allowing him to access medical care.

294.    Under Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

295.    Harris Health each have an obligation to provide modifications to their policies, procedures, and practices if they know or should know that a detainee is disabled and needs a modification.

296.    Despite knowing that Kristopher's obvious disability prevented him from understanding his need for treatment and advocating for himself, caring for himself and his basic

54

needs, and thinking clearly and making decisions, including accessing food, water, and medical care, Harris Health abided by a continuous policy of discrimination against mentally ill detainees and failed to provide reasonable accommodations which would have enabled him to access food, water, and medical care on an equal basis with non-disabled detainees, such as enhanced monitoring, assisted meal intake, proactive medical rounds and vitals checks, adequate evaluations to determine capacity, or transfer to an outside facility.

297.    Due to Haris Health's failure to provide Kristopher with reasonable accommodations, Kristopher was deprived of access to medical care, ultimately leading to his death.

298.    As a result of Harris Health's failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners, Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

## COUNT 11
### American with Disabilities Act - Against Defendant Harris Center

299.    Plaintiff incorporates all previous paragraphs as if fully restated here.

300.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

301.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

302.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

303.    The Harris Center for Mental Health and IDD is a public entity as defined in 42 U.S.C. § 12131(1), as a local mental health authority designated pursuant to Chapter 534 of the Texas Health and Safety Code.

304.    As a service, program, or activity, the Harris Center administers and delivers mental health evaluation, assessment, and treatment services to detainees at the Harris County Jail, including through the operation of the mental health front-door evaluation process at the jail's intake facilities.

305.    At all times relevant to this Complaint, in light of his severe mental illness, Kristopher was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

306.    Due to his mental illness, Kristopher was substantially limited in one or more major life activities, including but not limited to his ability to think, care for his basic needs, communicate with others, and access mental health care on his own initiative.

307.    As a pretrial detainee at Harris County Jail, Kristopher was qualified to receive the mental health services and participate in the programs and activities administered by the Harris Center at the jail.

308.    As a result of his mental disability, Kristopher required reasonable accommodations allowing him to access the Harris Center's mental health evaluation and

56

treatment services, including proactive identification at intake, front-door mental health evaluation, and ongoing monitoring and intervention that did not depend on his own ability to seek or request care.

309.    Under Title II of the ADA and 28 C.F.R. § 35.130(a), the Harris Center was responsible for ensuring that individuals in custody with known disabilities were provided with reasonable accommodations to prevent discrimination on the basis of disability in the delivery of its mental health services at the jail.

310.    The Harris Center had an obligation to provide modifications to its policies, procedures, and practices upon knowing or having reason to know that a detainee was disabled and required a modification to access its services.

311.    Despite knowing, or having reason to know, that Kristopher's schizophrenia prevented him from independently seeking or accessing mental health care, the Harris Center failed to conduct the mental health front-door evaluation at his January 2025 intake that had been completed at his prior incarceration, failed to initiate any mental health assessment or intervention following documented signs of decompensation, and failed to implement any proactive monitoring or modified access protocol that would have enabled him to receive mental health services on an equal basis with non-disabled detainees.

312.    The Harris Center's failure to provide reasonable accommodations for Kristopher's mental illness — including the failure to conduct the front-door evaluation, the failure to initiate proactive mental health contact, and the failure to implement any protocol accounting for his known inability to self-advocate — constituted discrimination on the basis of disability in violation of Title II of the ADA.

313.    Due to the Harris Center's failure to provide Kristopher with reasonable accommodations, Kristopher was deprived of access to mental health evaluation and treatment services during his final incarceration, contributing to the deterioration of his condition and ultimately to his death.

314.    As a result of the Harris Center's failure to provide reasonable accommodations for his mental illness, and its continuous failure to modify its service delivery to account for the known barriers faced by seriously mentally ill detainees who cannot self-advocate, Kristopher suffered extreme mental and physical pain and anguish, as described in this Complaint

## COUNT 12
## Section 504 of the Rehabilitation Act - Against Defendant Harris County

315.    Plaintiff incorporates all previous paragraphs as if fully restated here.

316.    Harris County provides services of food, water, and medical care to detainees of the Harris County Jail.

317.    Krisopher McGregor was qualified to receive these services.

318.    Because of his disability, Krisopher McGregor was substantially limited in his ability to access these services.

319.    In order to access these services, Kristopher McGregor required reasonable accommodations from Harris County in the manner in which it provided these services.

320.    Harris County failed to make reasonable modifications to its provision of these services in order to accommodate Kristopher McGregor's disabilities.

321.    Harris County receives federal funding.

322.    As a result of Defendants' failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners,

Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

## COUNT 13
### Section 504 of the Rehabilitation Act - Against Defendant Harris Health

323. All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

324. Harris Health provides medical and mental health care services to detainees of the Harris County Jail and receives federal financial assistance, including as a Medicare and Medicaid provider and recipient of federal grants.

325. Kristopher McGregor was qualified to receive these services.

326. Because of his disability, Kristopher McGregor was substantially limited in his ability to access these services.

327. In order to access these services, Kristopher McGregor required reasonable accommodations from Defendants in the manner in which they provided these services.

328. Harris Health failed to make reasonable modifications to its provision of medical and mental health care services in order to accommodate Kristopher McGregor's disabilities.

329. Harris County receives federal financial assistance.

330. As a result of Defendants' failure to provide reasonable accommodations for his mental illness, and their continuous policy of discrimination against mentally ill prisoners, Kristopher suffered extreme mental and physical pain and anguish, as described in this complaint.

## COUNT 4
### Section 504 of the Rehabilitation Act - Against Defendant Harris Center

59

331. All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

332. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794.

333. The Harris Center for Mental Health and IDD receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, including as a recipient of federal behavioral health grants and Medicaid funding administered through the Texas Health and Human Services Commission.

334. The Harris Center administers and delivers mental health evaluation, assessment, and treatment services to detainees at the Harris County Jail as a program or activity within the meaning of 29 U.S.C. § 794.

335. At all times relevant to this Complaint, Kristopher McGregor was an otherwise qualified individual with a disability within the meaning of Section 504, in light of his diagnosed schizophrenia and its substantial limitation on one or more major life activities, including his ability to think, care for his basic needs, communicate with others, and access mental health care on his own initiative.

336. As a pretrial detainee at Harris County Jail, Kristopher was qualified to receive the mental health services administered by the Harris Center at the jail.

337. By reason of his disability, Kristopher was substantially limited in his ability to access the Harris Center's mental health services through the standard demand-driven process,

which required a detainee to self-identify, self-refer, or otherwise initiate contact with mental health services.

338.    In order to access the Harris Center's mental health services on an equal basis with non-disabled individuals, Kristopher required reasonable modifications to the manner in which those services were delivered, including proactive identification at intake through the Harris Center Front Door evaluation process, proactive mental health outreach and assessment that did not depend on his own ability to seek or request care, and ongoing monitoring and intervention accounting for his known inability to self-advocate.

339.    The Harris Center had knowledge, or reason to know, that Kristopher was a person with a serious mental illness who required modifications to access its services, based on his documented history across multiple incarcerations at the Harris County Jail, the accessibility of that history in the institutional record, and the Harris Center's own prior completion of the Harris Center Front Door evaluation at his March 2024 intake.

340.    Despite this knowledge, the Harris Center failed to conduct the mental health front-door evaluation at Kristopher's January 2025 intake, failed to initiate any proactive mental health contact or assessment during his final incarceration, and failed to implement any modified service delivery protocol that would have accounted for his known inability to independently access mental health care.

341.    The Harris Center's failure to provide reasonable modifications to its mental health service delivery at the Harris County Jail, solely by reason of Kristopher's disability, constituted discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

342.    As a direct and proximate result of the Harris Center's failure to provide reasonable modifications, Kristopher was denied access to mental health evaluation and

treatment services during his final incarceration, contributing to the deterioration of his condition and ultimately to his death.

343.   As a result of the Harris Center's violations of Section 504, Kristopher suffered extreme mental and physical pain and anguish, as described in this Complaint, and Plaintiff has sustained the damages described herein.

**COUNT 15**
**42 U.S.C. § 1983 – Against Defendants Naomi Lockett, Laxman Sunder, Elizabeth Thoyakulathu, Kenneth Ihaza, Lakeshia D. Green, Elizabeth Anderson, Regenia Roach, Kennedi Harris, Fidelia Osifo-Selormey, Ethan Sowell, Paul Cormier, and Lori Jefferson, in their Individual Capacities**

344.   All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

345.   Defendants Naomi Lockett, Laxman Sunder, Elizabeth Thoyakulathu, Kenneth Ihaza, Lakeshia D. Green, Elizabeth Anderson, Regenia Roach, Kennedi Harris, and Fidelia Osifo-Selormey, Ethan Sowell, Paul Cormier, and Lori Jefferson in their individual capacities, were each responsible for the care, classification, screening, supervision, medical care, and mental health care to Kristopher McGregor during his final incarceration at Harris County Jail from January 2, 2025 through January 30, 2025.

346.   Each of these Defendants was aware of facts from which an inference of substantial risk of serious harm to Kristopher could be drawn, including his documented diagnoses of schizophrenia, moderate protein-calorie malnutrition, dehydration, underweight status, and physical deconditioning, and his documented inability to advocate for himself or access care voluntarily by reason of his mental illness.

347.   Each of these Defendants either drew that inference or consciously disregarded it.

348. Despite their awareness of these facts and the grave risk they presented, each of these Defendants failed to take reasonable measures to address that risk. Specifically:

349. Defendant Naomi M. Lockett, personally ordered a chest X-ray for Kristopher on January 3, 2025, accessing his electronic medical record and his active problem list documenting nine serious medical conditions including schizophrenia, underweight status, and dehydration. Despite this access, Dr. Lockett took no clinical action, initiated no monitoring protocol, and made no mental health referral, which she had authority to do as Medical Director.

350. Defendant Laxman Sunder, M.D., as the attending physician of record for Kristopher's entire final incarceration, failed to order any proactive monitoring, nutritional intervention, or clinical escalation, and took no documented clinical action during the twelve-day period between January 17 and January 29, 2025, during which Kristopher received no clinical attention of any kind.

351. Defendant Elizabeth Thoyakulathu, on January 12, 2025, reviewed Kristopher's active problem list documenting nine serious medical conditions and concluded that because his blood pressure was within normal range, no further intervention was needed, discharging him from the clinic without a weight monitoring order, food intake plan, respiratory follow-up, or mental health referral.

352. Defendant Kenneth Ihaza, N.P., on January 5, 2025, formally documented that Kristopher showed signs of distorted perception of reality and mood disturbance on a structured clinical capacity assessment, yet ordered only psychoeducation and took no further clinical action.

353. Defendant Lakeshia D. Green, on January 15, 2025, documented in writing that Kristopher had an inability to fully advocate for himself and was at elevated risk of victimization

63

due to his mental illness, yet took no clinical action beyond recommending a housing transfer and provided no notification to a prescribing clinician.

354. Defendant Kennedi Harris, L.M.S.W., on January 17, 2025, documented that Kristopher presented with flat affect, low speech, inability to maintain eye contact, and internal preoccupation, and recommended he remain in step-down housing for closer monitoring, yet failed to escalate when that recommendation was not followed.

355. Defendant Elizabeth Anderson, L.M.S.W., on January 17, 2025, discharged Kristopher from the Step Down Unit to the general population within two hours of Ms. Harris's progress note recommending continued monitoring, eliminating the last structured clinical oversight in place for Kristopher.

356. Defendant Regenia Roach, on January 17, 2025, co-signed the discharge summary discharging Kristopher from the Step Down Unit to the general population, approving the discharge decision that eliminated the last structured clinical oversight in place for Kristopher.

357. Defendant Fidelia Osifo-Selormey, N.P., on January 4, 2025, conducted Kristopher's intake assessment and recorded his condition as good and stable despite his nine-item active problem list, recorded an erroneous weight without investigation, and entered no mental health referral, no nutritional intervention, and no escalation arising from his documented history of malnutrition and failure to thrive.

358. Defendant Ethan Sowell, on January 2, 2025, conducted Kristopher's intake medical and mental health screening and answered every one of the 38 screening questions "No." Officer Sowell affirmatively recorded no possible mental health issues, declined to refer Kristopher to medical staff, and left the medical officer signature, screening decision, and all

64

notification fields blank, ensuring that no clinical or mental health response was triggered at the first and most critical point of contact in Kristopher's final incarceration.

359.    Defendant Paul Cormier, on January 4, 2025, conducted Kristopher's primary classification assessment and, despite the classification system affirmatively flagging known past or present institutional behavior problems and despite having access to Kristopher's full institutional history including prior MHU housing assignments, prior psych referrals, prior infirmary admissions, and prior hospitalizations, added no high-risk designations, no special conditions, and no medical or mental health flags to the booking, and set Kristopher's next classification review date for March 5, 2025. This ensured that no heightened monitoring or protective oversight would be applied to a detainee whose history demanded it.

360.    Defendant Lori Jefferson, on January 12, 2025, personally responded to and supervised an incident in which Kristopher reported to officers that his life was in danger and that he had been repeatedly threatened by fellow inmates. Sergeant Jefferson directed the response and had direct personal contact with Kristopher during his removal to a holding cell. Despite this contact with a known mentally ill detainee who had communicated fear for his life Sergeant Jefferson made no mental health referral, took no steps to ensure Kristopher received a clinical evaluation, and filed no mental health notification of any kind, responding to a mental health crisis as a classification matter and nothing more.

361.    The foregoing acts and omissions of each Defendant constituted deliberate indifference to Kristopher's serious medical needs in violation of his rights under the Fourteenth Amendment to the United States Constitution.

362.    Each Defendant's deliberate indifference was a proximate cause of Kristopher's suffering and death.

363.    Said acts and omissions were undertaken in wanton disregard for the rights and safety of Kristopher McGregor.

364.    Each Defendant is liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983.

## COUNT 16
## Wrongful Death – Against All Defendants

365.    All preceding and subsequent paragraphs of this Complaint are incorporated into this Count as though fully restated herein.

366.    Kristopher died by the fault of the defendants' deliberate indifference to his serious medical needs.

367.    Plaintiff, Kristopher's mother, brings this suit to recover damages which she sustained as a result of Kristopher's death.

368.    As a result of Kristopher's death, his mother and family have lost his love, affection, and companionship.

369.    As a result of Kristopher's death, his mother and family have also experienced pain, suffering, and distress resulting from his death.

370.    Plaintiff further seeks medical and funeral expenses for Kristopher, as well as costs and attorney fees.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgement against Defendants, actual damages, punitive damages, costs, attorney's fees, interest, disbursement, and any other and further relief this Court deems just and equitable.

Date: June 30, 2026                                  Respectfully submitted,


/s/ Brittany Francis  [with consent]              /s/ Stephen H. Weil

Brittany Francis                                   Sam Harton*(Ill. Bar No. 6342112
brittany@peoplescounsel.org                        Stephen Weil*(Ill. Bar No. 6291026)
                                                   Colton Johnson Taylor*(Ill. Bar. No.
Peoples' Counsel 1900                              6349356)
W. Gray Street
P.O. Box 130442                                    Romanucci and Blandin, LLC 321 N.
Houston, TX 77219                                  Clark St.
Telephone: (713) 487-9809                          Chicago, IL 60654
                                                   Tel: (312) 458-1000
Texas Bar No. 24141616 SDTX                        Fax: (312) 458-1004
Bar No: 3837908                                    sharton@rblaw.net
                                                   sweil@rblaw.net
                                                   cjohnson@rblaw.net


                                                   *Counsel for Plaintiff*


                                                   * Admission *pro hac vice*